UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| Jiangxi Brother Pharmaceutical Co., Ltd., <br><br> Plaintiff, <br><br> v. <br> United States, <br><br> Defendant, <br> and <br><br> Solvay USA, LLC, <br> Defendant-Intervenor. | Court No. 25-00187 |

**MEMORANDUM OF LAW IN SUPPORT OF
THE RULE 56.2 MOTION OF PLAINTIFF
JIANGXI BROTHER PHARMACEUTICAL CO., LTD.
FOR JUDGMENT UPON THE AGENCY RECORD**

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
 Counsel for Plaintiff Jiangxi Brother
 Pharmaceutical Co., Ltd

Dated: March 23, 2026

TABLE OF CONTENTS

Table of Contents........................................................................................i

Table of Auhorities ................................................................... ii

I.     INTRODUCTION .........................................................................1

II.    STATEMENT PURSUANT TO RULE 56.2(c)............................................2

    A. Administrative Determination Under Review...........................................2

III.   Issues of Law ...............................................................................2

IV.    Summary Of Arguments.................................................................3

V.     Statement Of Facts.......................................................................4

VI.    STANDARD OF REVIEW...............................................................6

VII.   ARGUMENT................................................................................8

    A. The Surrogate Value for the Valuable By-Product was
       Miscalculated...........................................................................8

    B. The Financial Statements Selected by the Department as the Basis
       of Surrogate Financial Ratios are Badly Flawed....................................11

       1. The Financial Statement of SQM is Not Usable...............................11

          i.   SQM is in a Different Industry ............................................11

          ii.  SQM's Non-Chemical Sector was Large and Highly
              Profitable...............................................................13

          iii. SQM's Operations Appears to have been Subsidized.........15

       2. The Soporole Financial Statement is Fatally Flawed.......................15

          i.   Soprole is in a Different Industry .......................................15

       3. The Other Financial Statements Are Usable....................................17

          i.   Methanex is Appropriate ....................................................17

          ii.  The Department Should Not Have Rejected the Use
             of MolymetNOS S.A. .........................................................18

          iii. Commerce should not have rejected the Financial
             Statement for Copeval  .......................................................19

    C. Cohen's D is not an appropriate test for conducting a differential
       pricing analysis........................................................................20

VIII.  CONCLUSION.............................................................................20

i

# TABLE OF AUTHORITIES

Court:

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .....................6

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974)........................................................................ 7

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012)........................................................................................7

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197(1938) ........................... 6

*Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021)........................................................................................9

*Diversified Products Corp. v. United States*, 6 CIT 155 (1983) ...............................7

*F.Lli De Cecco Di Filippo Fara S. Martino S.P.A. v. United States*, 216 F.3d 1027 (2000) (Fed. Cir)........................................................................................9

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997).......................7

*Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024) ..................................6

*Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301(Fed. Cir. 2009)......................7

*Marmen Inc. v. United States,* 134 F.4th 1334 (Fed. Cir. 2025) .............................20

*Novosteel SA v. United States,* 284 F. 3d 1261 (Fed. Cir. 2002)..............................7

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) ......................9

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)....................9

*SKF USA, Inc. v. United States.* 254 F.3d 1022 (Fed. Cir. 2001) .............................7

*Tung Mung Dev. Co., v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) ..................7

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..........................................6

*USX Corp. v. United States*, 11 CIT 82, 655 F. Supp. 487(1987)............................7


Statute and Regulatory:

19 U.S.C. §1516a(a)(2)(A)(i)(I)..................................................................................2

19 U.S.C. §1516a(a)(2)(B)(iii)....................................................................................2

19 U.S.C. §1516a(b) ...................................................................................................6

19 U.S.C. §1673d(c)(5)...............................................................................................6

28 U.S.C. §1581(c) .....................................................................................................2

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| Jiangxi Brother Pharmaceutical Co., Ltd., <br><br> Plaintiff, <br><br> v. <br><br> United States, <br><br> Defendant, <br> and <br><br> Solvay USA, LLC, <br> Defendant-Intervenor. | Court No. 25-00187 |

## I.   <u>INTRODUCTION</u>

This is an appeal from the final results of the Antidumping Duty Investigation of Vanillin from China.  Plaintiff  Jiangxi Brother Pharmaceutical Co., Ltd ("JXB") was a mandatory respondent in the investigation.  JXB was a party to the proceeding, having filed numerous questionnaire responses and comments, as well as a case brief.

The JXB asserts the following errors in the Commerce Department's ("Commerce" or "Department") final determination:

- **The value assigned by the Department to the valuable by-product Hydroquinone was aberrant.  In assigning this value, the Department ignored multiple data points establishing a non-aberrant value for this valuable by-product and used internally inconsistent data.**

- **The Department erred when selecting financial statements for the purposes of the financial ratios.  The selected financial statements were for companies and operations which were highly dissimilar to the operations of JXB.  The Department ignored financial statements of record for companies with operations similar to that of JXB.**

1

- **The Department erred when it used the Cohen's D test in conducting its analysis for purposes of differential pricing. The use of Cohen's D has been rejected by the U.S. Court of Appeals for the Federal Circuit. While it had no direct impact on the final calculation this issue is highly relevant if this matter is remanded to make other corrections as, at this point, the differential pricing analysis potentially becomes relevant.**
- 

## II.    STATEMENT PURSUANT TO RULE 56.2(c)

### A. Administrative Determination Under Review

This action is brought pursuant to the authority of 19 U.S.C. §1516a(a)(2)(A)(i)(I), 19 U.S.C. §1516a(a)(2)(B)(iii), and 28 U.S.C. §1581(c) to contest the U.S. Department of Commerce's ("Commerce" or "Department") Order in Vanillin from the People's Republic of China, *Vanillin From the People's Republic of China: Antidumping and Countervailing Duty Orders,* 90 Fed. Reg. 35,504 (July 28, 2025) ("Order") (P.R 323) and the underlying final administrative determination and the accompanying Issues and Decision Memorandum. *Vanillin From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 24093 ("I and D Memo") (June 6, 2025) (P.R. 312 – 313 and 317).

In the Final Results, Commerce calculated a rate of 190.20% for JXB. This rate is also reflected in the final order. (P.R.323)

## III.    Issues of Law

The Plaintiffs present the following issues. As detailed herein, Commerce's determination was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law. The issues are:

- **Whether the value assigned to the primary by-product was aberrational and against the weight of the evidence.**

The Department improperly assigned a value to the primary by-product which did not reflect the value of the by-product and which substantially understated the value. Such decision was both arbitrary and capricious and was also contrary to the facts of record.

- **Selection of Financial Statements for Purposes of Surrogate Financial Ratios**

Whether the Department can select, for purposes of calculating surrogate financial ratios, entities which are in wholly different industries than respondent where other financial statement are of record. The selection of financial statements for calculation of financial ratios must reasonably reflect the operations for which they are to serve as a surrogate.

- **Improper Use of Cohen's D**

Whether the Department can continue to use as a test in the differential pricing analysis a method which has been rejected as improper by the U.S. Court of Appeals for the Federal Circuit. To the extent that the Department can lawfully conduct a differential pricing analysis, it cannot use such flawed test.

## IV. <u>Summary Of Arguments</u>

The Department committed multiple errors which artificially increased the margin. Each of these errors are significant and the matter should be remanded to the Department to correct such errors.

Initially, the Department miscalculated the value for the valuable by-product Hydroquinone. The Department was faced with a choice of two sets of data. The data supplied by petitioner, and ultimately used by the Department, was denominated in KG (a weight measure) and KN (a unit of force). The data supplied by plaintiff, in contrast, reported consistent numbers for primary and secondary

3

quantities and reported these values in KG (a weight measure).  The Department's choice to use internally inconsistent data where one of the two data points was denominated in a unit of force, not a unit of weight where there was a consistent data point of record is an abuse of discretion.

Secondly, the Department used as the basis for financial ratios two companies which were in very different industries.   The plaintiff is a fine chemical company and produces its products by reacting together various chemicals to produce new and different chemicals.   One of the financial statements selected by the Department is primarily, as stated in its own clear words, is primarily a mining company, deriving most of its revenue and profits from mining operations and the processing of such mined products.   To the extent it produces any chemicals, such chemicals are not a significant part of their operations and critically, to the extent that the results are broken out, such alternate operations are significantly less profitable.  The other financial statement is for a company in the Dairy Industry which does not produce chemicals, but rather only uses a limited range of chemicals in preparing consumer dairy products.   In contrast, the Department has of record other usable financial statements which are of companies which produce chemicals and are thus similar to the operations of plaintiff.

Thirdly, the Department used the Cohen's D test in conducting its differential pricing analysis.  The use of Cohen's D has been found to be improper by the Court of Appeals for the Federal Circuit.  To the extent that a differential pricing analysis is relevant, such analysis should not have used Cohen's D as a test.

## V.   <u>Statement Of Facts</u>

The antidumping duty investigation on Vanillin From the People's Republic of China was initiated on July 1, 2024.  (See, *Vanillin from the People's Republic of China: Initiation of Less-Than-Fair Value Investigation, 89 FR 54424 (July 1,*

*2024)*) (P.R. 32) as a result of the petition filed by the domestic industry.   (P.R.1). On January 16, 2025, Commerce published its preliminary results as *Vanillin from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures,* 90   Fed. Reg. 4720 (January 16, 2025) (P.R. 261) accompanied by Commerce's Issues and Decisions memo entitled *Decision Memo for the Preliminary Affirmative Determination in the Investigation of Sales at Less Than Fair Value of Vanillin from the People's Republic of China From Scot Fullerton, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty  Operations to Steven Presing, Acting Deputy Assistant Secretary for Policy and Negotiations* (January 8, 2025) ("PDM"), (P.R. 252).   Plaintiffs were assigned a rate of 186.20%. (P.R. 261) .

Commerce issued its final results on June 3, 2025 as *Vanillin from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 24093 (June 6, 2025). (P.R. 317)   In the final results the Department assigned a rate of 190.20% to plaintiff. (P.R. 317) accompanied by Commerce's June 2, 2025 Decision Memo from *Scot Fullerton, Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty  Operations to Christopher Abbott, Deputy Assistant Secretary for Policy and Negotiations performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance*. (P.R. 313). On July 28, 2025 Commerce published the Antidumping duty order as *Vanillin from the People's Republic of China: Antidumping and Countervailing Duty Orders*, 90 Fed. Reg. 35504 (July 28, 2025).(P.R. 323).

## VI.     <u>STANDARD OF REVIEW</u>

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law. 19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether Congress has directly spoken to the precise question at issue.

If the statute is silent or ambiguous with respect to the specific issue, the Supreme Court has held that it is responsibility of the Federal Courts to determine the meaning of the law. *Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024). Loper* stated in relevant part "*Chevron* is overruled. Courts must exercise their dependent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright* 144 S.Ct. 2244 at 2273.

Furthermore, once the statute has been properly interpreted by the Court, the question is then whether the decision is supported by substantial evidence. Substantial evidence is well defined by Court precedent.  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938).  Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted).  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'"

6

*Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987). The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Moreover, when substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

It is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner. *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004). Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g., SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, while  "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974).

## VII.     <u>ARGUMENT</u>

### A. <u>The Surrogate Value for the Valuable By-Product was Miscalculated</u>

In the final results the Department assigned a value to the valuable by-product Hydroquinone of $8.00 per KG rather than a correctly calculated value of approximately $24.00 per KG. There is no dispute as to the HTS provision under which this by-product is classified. Both the petitioner and JXB agree that the correct HTS provision is 2907.22. (I and D Memo at 8)(P.R. 312) The dispute revolves around the interpretation of the supporting data. The petitioner provided data which showed two data points (a primary and secondary quantity) for a single HTS provision. (P.R. 216 at 24). These two data points reported two different quantities, one of which was purportedly in Kilonewtons and the other in Kilograms. A kilonewton is a unit of force, not a unit of weight. It represents the force needed to accelerate a 1000 KG mass at 1 meter per second squared. As discussed further below, such quantities were not internally consistent.

In contrast, the data provided by JXB was consistent and provides the same quantity for both the primary and secondary quantities and both were reported in Kilograms – a unit of weight. Further, the raw data supplied by JXB was for a greater value of goods. The total value of petitioner's data for HTS2907.22 was $82,354, while the total value of JXB's data was 164,702, or nearly double that of petitioner's value. (P.R. 213) (See Exhibit 1 for a summary of the two portions of SV as derived from the two submissions of surrogate values. (P.R. 216 and P.R 213).)

However, in calculating the surrogate value, Commerce used the one "quantity" which was inconsistent with the rest of the data. Petitioner's quantity neither agrees with the other data supplied by petitioner nor does it agree with any of the data supplied by JXB. The UN Comtrade data provided by JXB clearly reported these numbers with weights reported in the unit of KGs, not the unit of

force of KNs. (P.R. 213) Where there are two data sources, one of which is consistent, and the other contains clear errors, and where the inconsistent data source has significant overlap with the consistent data, the consistent data source should be used particularly for those points of overlap, and to the extent that the inconsistent data source were to be used, it should be adjusted to agree with the consistent data source. A basic purpose of the antidumping duty laws is that of determining margins as accurately as possible and where the Department selects the clearly aberrational data from a pool of otherwise consistent data, the Department has abused its discretion. (See *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("The agency's presumption implements the basic purpose of the statute — determining current margins as accurately as possible.") (See also, *F.Lli De Cecco Di Filippo Fara S. Martino S.P.A. v. United States*, 216 F.3d 1027 (2000) (Fed. Cir), *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) and *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021).)

Furthermore, the data source provided by JXB is that of a public source (UN Comtrade), while that of petitioner is provided by a private source. Comtrade is a public source which has been found to be reliable and has been used by Commerce in multiple cases. Where the Department has a choice between a public source provided by a well-recognized public organization (the United Nations) and a private source of data, JXB submits that the public source should be given precedence, particularly where, as here, all of the data of the public source is confirmed by its inclusion of the same value data in the private source with additional data also included in the public source.

Finally, the data provided by JXB, contrary to the assertion of the Department in the final determination, (I and D Memo at 10)(P.R. 312) is broader than that proposed by petitioner and used by the Department. Every shipment included in the

9

raw data provided by the petitioner is also reflected in the raw data provided by JXB. The JXB data, in contrast, is broader and provides additional data not in the petitioner data. In other words, using the Department's stated test, "it is consistent with our practice to use the AUV that is based on a broader market average", (I and D Memo at 10)(P.R. 312) the JXB data is the better data as it includes ALL of the data proposed by petitioner plus additional data.

In sum, the data provided by the petitioner was not as reliable as the data provided by JXB. In contrast, the data provided by JXB has been fully corroborated by the accurate portion of the data supplied by petitioner and thus Commerce should have used this data in calculating the value for the valuable by-product.

In the final results, the Department tried to argue that the "difference" in the units of measure did not make the data any less reliable and that JXB had failed to demonstrate that the difference resulted in an inaccuracy. (I and D Memo at Final Results at 10)(PR 312) Further, the Department ignored the fact that the data pool for the public source data was greater than the private source data. The total value of petitioner's data for HTS 2907.22 was $82,354, while the total value of JXB's data was 164,702, or nearly double that of petitioner's value. Furthermore, the Department's analysis does not address why data with an internal inconsistency, derived from a smaller pool, and with different units of measure (including one for force as opposed to weight) is more accurate than consistent data with consistent units of measure drawn from a larger pool of data.

In fact, petitioner's data demonstrates that the data is internally inconsistent. If KN and KG are a transferable unit of measure, than the data/ratio between the two would be consistent. This is not the case, the ratio is not consistent. As shown in Exhibit 1, which is derived from the surrogate value data, certain of the shipments show a variance of between 62% and 95%, while others show a variance of only 2% to 8%. (P.R 216) In sum something is clearly wrong with the data provided by

10

petitioner and used by the Department.  In contrast, the alternate public data provided by JXB is consistent and does not show any variance.  (P.R. 213)

Based on the foregoing, it is clear that the Department used the wrong values for calculating the value for the valuable by-product Hydroquinone.    The matter should be remanded to the Department with instructions that they use the correct and consistent data to calculate this value.

**B. <u>The Financial Statements Selected by the Department as the Basis of Surrogate Financial Ratios are Badly Flawed</u>**

As discussed herein, the two financial statements to calculate surrogate financial ratios used by the Department are badly flawed for a broad range of reasons and should not have been selected.  In contrast, the Department had of record other financial statements which were not similarly flawed.  Specifically, in ascertaining the surrogate financial ratios Commerce used two financial statements -- Sociedad Química y Minera de Chile S.A. ("SQM"), and Soprole Inversiones S.A. ("Soprole").  The financial statements of SQM and Soprole are unusable for a range of reasons and Commerce improperly rejected the alternate financial statements placed on the record by JXB.  The Court should remand this matter and direct Commerce to recalculate the financial ratios using reliable and representative financial statements.

       1.     The Financial Statement of SQM is Not Usable

          i.  SQM is in a Different Industry

The Department relied upon the financial statement of  Financial Statement of Sociedad Química y Minera de Chile S.A. ("SQM").   This financial statement has numerous flaws.   The first flaw, which is sufficient on its own to disqualify the use of this financial statement, is that SQM is not a member of the same industry as JXB. JXB belongs to the fine chemical industry, and the subject merchandise vanillin

belongs to the chemical food ingredients industry.  Such products must be produced to high standards to ensure that it can be consumed by humans.

In contrast, SQM belongs to the mining industry.  As clearly stated on pages 1 and 2 of the form 20-F (Form 20 at pages 14 – 15)(P.R. 169) filed with the U.S. Securities and Exchange Commission, mining is critical to the operations of the company, and in fact, the business is substantially dependent on exploitation rights and mineral extraction.  The SEC filing clearly states:

> **Our business is substantially dependent on the exploitation rights** under the Corfo Agreements, since all of our products originating from the Salar de Atacama are derived from **our extraction operations** under the Corfo Agreements. For the year ended December 31, 2023, **revenues related to products originating from the Salar de Atacama represented 73% of our consolidated revenues**, consisting of revenues from our potassium business line and our lithium and derivatives business line for the period. As of December 31, 2023, only seven years remain on the term of the Corfo Agreements and we had extracted approximately 43% of the total permitted accumulated extraction and sales limit of lithium under the lithium extraction and sales limits.
>
> Form 20-F at pages 14 – 15 (P.R. 169).

This official filing with the U.S. Government  also discusses the substantial costs of being a member of the mining industry and the substantial mining machinery required.    The document states:

> Our business is capital intensive. Specifically, the exploration and exploitation of reserves, mining and processing costs, the maintenance of machinery and equipment and compliance with applicable laws and regulations require substantial capital expenditures. We must continue to invest capital to maintain or to increase our exploitation levels and the amount of finished products we produce. For example, we have a US$2.4 billion investment plan for the years 2024-2025. The plan will allow us to expand our operations of lithium, iodine and nitrate by accessing natural resources both in the Salar de Atacama and caliche ore deposits in Chile, through the 50,000 metric ton Mt. Holland lithium hydroxide project in Western Australia (a joint venture that we are developing with our partner Wesfarmers) and the development of a 20,000 metric ton lithium hydroxide plant in China which is fed with lithium sulfate sourced from the Salar de Atacama. The plan also aims to increase our mining capacity while protecting the environment, reduce operational costs and increase our annual production capacity of nitrates and iodine to meet expected growth in those markets.
>
> Form 20-F at pages 16. (P.R. 169)

12

Critically, in this official filing with the United States government, SQM acknowledges that its products are based on the mineral deposits mined by the company.   The filing states:

> **Our products are mainly derived from mineral deposits found in northern Chile.** We mine and process caliche ore and brine deposits. The caliche ore in northern Chile contains the only known nitrate and iodine deposits in the world and is the world's largest commercially exploited source of natural nitrates. The brine deposits of the Salar de Atacama, a salt encrusted depression in the Atacama Desert in northern Chile, contain high concentrations of lithium and potassium as well as significant concentrations of sulfate and boron.
>
> From our caliche ore deposits, we produce a wide range of nitrate-based products used for specialty plant nutrients and industrial applications, as well as iodine and iodine derivatives. At the Salar de Atacama, we extract brines rich in potassium, lithium, sulfate and boron in order to produce potassium chloride, potassium sulfate, lithium solutions and bischofite (magnesium chloride). We produce lithium carbonate and lithium hydroxide at our plant near the city of Antofagasta, Chile, from the solutions brought from the Salar de Atacama. We market all of these products through an established worldwide distribution network.

Form 20-F at page 37. (Emphasis Added) (P.R. 169  )

In sum, the operations of SQM are primarily involved in the extraction and processing of materials extracted from the ground by SQM and from a source controlled by SQM.   This is dissimilar to the operations of JXB.  As shown in Exhibit D-2, (C.R. 88) which is the production process, the inputs in the production process are phenol, Hydrogen Peroxide, Methanol, Glyoxilic Acid, and Liquid Caustic soda.  In addition, several other intermediate chemicals are produced during the production process.  (C.R. 88).   All of these materials were purchased from a range of outside suppliers.  NONE of the raw materials were obtained by JXB through the process of mineral extraction by JXB, and the raw materials are all intermediary chemicals.  JXB is, at its core, a chemical company that purchases intermediate chemicals and uses such chemicals to produce its products through reactions, mixing and blending.

ii.     SQM's Non-Chemical Sector was Large and Highly Profitable

To the extent that SQM produces chemicals, such chemical production is a very small portion of its business and has vastly different financial results. Specifically, the chemical sector, which is also not fully broken out, has a significantly lower gross margin.   As shown on page 55 of its financial report, the industrial chemicals sector showed a gross margin of 19% in 2023.  In contrast, the Iodine and Derivatives Sector showed a gross margin of 60%, and the Lithium and Derivatives Sector showed a gross margin of 43%.  (SQM Financial Statement, Bar code 4654595-03 at page 68.) (P.R.169)  Critically, as shown on page 80 of the same document, the percentages of revenue for industrial chemicals was **2%**, while that of Iodine was 12% and Lithium was 69%. (SQM Financial Statement, Bar code 4654595-03 at page 93) (P.R.169).

This is important as this demonstrates that the very high profit margin calculated for SQM is directly related to the very high gross margin for two dissimilar industries and those two dissimilar industries constituted the supermajority (81%)  of SQM's revenue.

This is further demonstrated on page F-111 of the financial statement which shows that in 2023 the overall profit was 41% (Revenue of 7,467,490 with gross profit of 3,075,054) while industrial chemicals only had a profit of 19% (Revenue of 175,223 with a gross profit of 33,872). (SQM Financial Statement at page 260)(P.R. 169)

Simply put, SQM had dis-similar operations, and critically, the financial ratios were overstated because of the significantly more profitable sectors of operations, which sectors were also significantly greater than the operations in the only sector which is arguably similar to JXB's operations.

14

iii.    SQM's Operations Appears to have been Subsidized

While not necessarily disqualifying by itself, it also appears that SQM's operations with respect to exports have been subsidized.  Specifically, at page F-103 of SQM's financial statement, it reports receipt of a government grant in 2023.  Such grant was "an unconditional government grant for $24,387 in September 2023, related to the permeance of its commercial office of SQM Shanghai Chemicals Co., Ltd" (SQM Financial Statement at pages 252) (PR 169) .   Where, as here, the financial statement is already, at best questionable, the presence of subsidies is a metaphorical final straw.

2.    The Soporole Financial Statement is Fatally Flawed

i.   Soprole is in a Different Industry

The Department also relied upon the financial statement of Soprole Inversiones S.A. ("Soprole").  As with SQM, this financial statement is flawed, and critically, is for an entirely different industry.  Simply put, Soprole's operations are highly dissimilar to those of JXB.  Soporole is in the dairy industry and is "present" in 10 product categories.   These are: liquid milk, yoghurt, desserts, aged cheese, fresh cheese, butter, margarine, creams, dulce de leche, waters and nectars. (Financial Statement of Soporole at page 10) (P.R. 218 at page 85).  By its own words, Soprole claims to belong to the "mass consumption industry sector which refers to the production of high-demand products and their subsequent marketing". ((Financial Statement of Soporole at page 18). (P.R.  218 at 93.)  In other words, Soprole produces and sells product intended for the consumer retail market.  Soprole is not in the chemical industry nor do its operations result in the reaction of chemicals with other chemicals to produce final products.  As noted in the financial statement,

15

the main equipment are milk silos, pasteurizers, cooling equipment, milk and juice packaging lines, and stainless steel tanks of different models and sizes.  ((Financial Statement of Soporole at page 116) (P.R. 219 at 37).

That Soporole is a member of the dairy industry, not the fine chemical industry, is further supported by Exhibit 16 to Petitioner's Final Submission of Surrogate Value information (P.R. 219 at 124 – 134).  This exhibit consists of webpages from Soporole's website showing the products produced by Soprole.  All of these products are "dairy" products, show that milk is the primary ingredient, and there is no evidence of any chemical reactions performed by Soprole.  Critically, such products are also packed for, and are ultimately, sold at retail without further processing.

In contrast, as shown in Exhibit D-2 to its Section D responses, JXB takes chemical inputs, reacts these inputs with other chemical inputs to produce new and different chemicals with a different molecular structure.   These chemicals are then reacted with other chemicals to produce yet another set of chemicals with different molecular structures.    This third set of chemicals is then reacted with other chemicals to produce the final products.  A chemical reaction results in changes in molecular bonds and is more than the mere mixing of different substances.

Furthermore, JXB produces and sells its products to industrial users that take JXB's chemicals and use them in producing other products.  JXB's products are not simply repacked and resold to the retail market.  Simply put, the operations by Soprole are so dissimilar from those of JXB that any use of these financial statements as a basis for financial ratios would be arbitrary on its face.

In the final results, the Department sought to justify this by arguing that the chemical Vanillin is a type of food flavor component and that, somehow, that SQM and Soprole were producers of comparable merchandise.  (I&D memo at 10)(P.R. 312).  Such analysis is unavailing as the Department does not distinguish between

16

different types of food products, and critically, simply dismisses the fact that SQM is in the mining industry by also arguing that it produces certain chemicals for human consumption and human injunction. Using the Department's logic, the Los Angles Dodgers are in the Restaurant Business simply because they sell Dodger Dogs at the ballpark ignoring the fact that the food is secondary or tertiary to the actual product. SQM is, as clearly stated in its reports, primarily a mining company and the other activities are simply not as significant and such activities are secondary to the primary activity.

The Department's stated logic for Soporole is equally flawed. The Department's logic is that since their products CONTAIN chemicals, they are in the chemical industry. (I&D Memo at 13)(P.R. 312). Under this logic, a PTA parent who bakes cookies for the School Bake sale is also a member of the Chemical Industry since the parent uses Acetic Acid (Vinegar), Sodium Chloride, and Sodium Bicarbonate in the cooking process. The facts are clear. Soporole is a dairy company that processes milk. It may USE chemicals (as virtually every industry uses chemicals) but it does not react raw materials to produce chemicals.

In contrast, the financial statements proposed by JXB are more appropriate. JXB provided three financial statements, any and all of which are appropriate. Each is analyzed in turn.

### 3. The Other Financial Statements Are Usable

#### a. Methanex is Appropriate

Commerce rejected the financial statement of Methanex based on the fact that Methanex was headquartered in Canada. (I&D Memo at 14)(P.R. 312) This, however, is not a sufficient reason to reject the financial statement of Methanex. While it is true that Methanex is headquartered in Canada, as was noted in the financial statement, it operated production facilities in a number of countries, including critically, Chile. As noted at page 1 of its financial statement, Methanex

17

operates TWO production facilities in Chile and supplies the Asia Pacific market. Furthermore, no other country has more than 2 operating production facilities. (Methanex Financial Statement at Page 1 at 37)(P.R. 209 at 37).   The production in Chile in 2023 was nearly double that of Canada.   Critically, Methanex lists Chile as one of the countries where it records the majority of its income. (Financial Statement at Page 17). (P.R. 209 at 53.)

The Department sought to use the financial statement of SQM even though the "chemical" revenue was only 2% of the total operations. (SQM Financial Statement) (P.R. 169 at page 68).   In contrast, the Methanex operations in Chile represent a greater share of the total revenue.   In other words, the Chile values represent a greater share of the Methanex operations than the chemical revenue represents of SQM's operations.  The Methanex Operations converts inputs into new and different chemical products by means of chemical reactions.  It is similar to JBP in that both convert raw materials into new products by reacting, not blending.  In addition, Methanex produces the same product at multiple facilities, as opposed to a diverse range of products at multiple facilities, the experience at one facility should reasonably reflect the operations at all facilities. (SQM Financial Statement) (P.R. 169)  The financial ratios therefore, for Methanex should reasonably reflect the operations of a chemical company in Chile.

Finally, as stated in the I&D Memorandum "It is not our practice to use consolidated financial statements that cover global operations when we have usable financial statements specific to the primary surrogate country available on the record."  (I&D Memo at 14)(P.R. 312).   As discussed above, the Department does not have usable financial statements of record, and thus this practice is not relevant.

      b. The Department Should Not Have Rejected the Use of MolymetNOS S.A.

Commerce rejected the financial statement of MolymetNos S.A.  ("MNS")

based on the fact that the unconsolidated financial statements do not provide sufficient information to calculate an overhead or SGA ratio and that it is a global financial statement. (I&D Memo at 14)(P.R. 312).  Commerce is wrong.  As shown in the calculation provided as Exhibit FSV-3(c)(i), (P.R. 209 at 122) all of the information in the financial statement can be placed into appropriate categories and all of the lines that would go into the calculation of ratios have been allocated to the appropriate lines.  While the level of detail is not high, there are no lines of the financial statement which cannot be properly allocated to one of the three Department categories.  As all of the data has been allocated, and as the data reconciles to the financial statement, the ratios provided are appropriate and thus Commerce's claim that a ratio could not be calculated is not correct and thus the reason for not including this financial statement is not valid.  The financial statement of MNS should be used in the calculation of ratios.

Finally, as stated in the I&D Memorandum "It is not our practice to use consolidated financial statements that cover global operations when we have usable financial statements specific to the primary surrogate country available on the record." (I&D Memo at 14)(P.R. 312).   As discussed above, the Department does not have usable financial statements of record, and thus this practice is not relevant.

> c. Commerce should not have rejected the Financial Statement for Copeval

Commerce rejected the financial statement of Copeval on the basis that the company was unprofitable.  This is factually incorrect.  As illustrated at page 4 of Copeval's Financial Statement, it was operating with a gross profit for the accumulated period, and critically, for the broken out quarterly period of July 1, 2024 to September 30, 2024, Copeval reported a net profit of 1,933,609.   (See Financial Statement of Copeval at page 4) (P.R. 209 at 139).  Commerce thus has data for Copeval for a fiscal period during which it ran at a net profit, and has additional data

for an extended period where it ran at a gross profit.  Furthermore, Copeval produces its products through the process of reacting different chemicals and not merely from the mixing of different materials.

Simply put, the Department has usable financial data for a company in the chemical industry which includes periods during which the company was profitable.

In sum, the financial statements used for the purposes of establishing surrogate financial ratios in the final results are not usable and should not have been used.  In contrast, the Department has of record financial statements which should be used as the basis for the financial ratios.

### C. Cohen's D is not an appropriate test for conducting a differential pricing analysis

The Department, in conducting its differential pricing analysis, used Cohen's D as the basis for its analysis. (See analysis Memorandum at 2)(C.R. 314)  This is incorrect    The Department of Commerce's use of Cohen's D in conducting a differential pricing analysis has been expressly overturned by the Court of Appeals for the Federal Circuit in *Marmen Inc. v. United States,* 134 F.4th 1334 (Fed. Cir. 2025).    To the extent that this analysis becomes relevant upon correction of the above cited errors, any new analysis cannot use Cohen's D in the differential pricing analysis.  At that time, it will be ripe for JXB to comment on any alternate methodology.

## V. CONCLUSION

Plaintiffs respectfully request that this Court:

Remand this matter to the Department of Commerce to recalculate the antidumping duty margin by recalculating the value for the valuable by-product

(Hydroquinone) and by calculating the financial ratios by using financial statements for representative industries and not using financial statements for non-representative industries.    In making these calculations, to the extent that the Department conducts a "differential pricing analysis", it cannot use the Cohen's D test in such analysis.

Respectfully submitted,

/s/ David J. Craven

David J. Craven
Counsel to Jiangxi Brother
Pharmaceutical Co., Ltd.

Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 245-4010
David.craven@tradelaw.com

Date March 23, 2026

21

Exhibit 1(a)
Petitioner Data

**Vanillin**

| Year | Month | Reporter | Reporter IS | Reporter Region | Trade Direc | Trade Partner | Trade Partn | Trade Partn | HS6 Code | HS6 Description | Tariff Line ( | Tariff Line Description | USD | Primary Quantity | Unit Price | Primary Units | Secondary Quantity | Unit Price | Secondary Units |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2024 | 3 | Chile | CL | Central & South America | Import | Belgium | BE | Europe | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 1,672.45 | 200 | 8.36 | KN | 750.67 | 2.23 | KG |
| 2023 | 10 | Chile | CL | Central & South America | Import | Commercial or Military Secret | ZZ | | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 82.24 | 0.5 | 164.48 | KN | 1.3 | 63.37 | KG |
| 2023 | 12 | Chile | CL | Central & South America | Import | Commercial or Military Secret | ZZ | | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 27.78 | 0.1 | 277.8 | KN | 1.01 | 27.57 | KG |
| 2023 | 10 | Chile | CL | Central & South America | Import | Germany | DE | Europe | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 49.80 | 1 | 49.8 | KN | 18.25 | 2.73 | KG |
| 2023 | 11 | Chile | CL | Central & South America | Import | Germany | DE | Europe | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 48.53 | 1 | 48.53 | KN | 6.5 | 7.46 | KG |
| 2024 | 2 | Chile | CL | Central & South America | Import | Germany | DE | Europe | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 25.21 | 0.1 | 252.1 | KN | 1.29 | 19.5 | KG |
| 2024 | 3 | Chile | CL | Central & South America | Import | Germany | DE | Europe | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 60.87 | 1 | 60.87 | KN | 16.67 | 3.65 | KG |
| 2023 | 12 | Chile | CL | Central & South America | Import | India | IN | Asia | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 24,622.18 | 2000 | 12.31 | KN | 2078 | 11.85 | KG |
| 2024 | 1 | Chile | CL | Central & South America | Import | India | IN | Asia | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 50,220.00 | 5400 | 9.3 | KN | 5634 | 8.91 | KG |
| 2024 | 1 | Chile | CL | Central & South America | Import | Italy | IT | Europe | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 5,274.63 | 100 | 52.75 | KN | 108.2 | 48.75 | KG |
| 2023 | 12 | Chile | CL | Central & South America | Import | Spain | ES | Europe | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 43.84 | 0.5 | 87.68 | KN | 1.65 | 26.59 | KG |
| 2023 | 11 | Chile | CL | Central & South America | Import | United States | US | North Amer | 290722 | Hydroquinone (Quinol) And Its Salts | 29072200 | Hydroquinone (Quinol) And Its Salts | 227.46 | 3.13 | 72.67 | KN | 3.2 | 71.08 | KG |
| | | | | | | | | | | | | | 82,354.99 | 7,707.33 | | | 8620.74 | | |

Exhibit 1(b)
COMTRADE

| Period | Trade Flow | Reporter | Partner | 2nd Partne | Customs Desc | Transport Mode | Commodity Co | Trade Value (US$) | Net Weight(kg | Gross Weig | Qty Unit | Qty | Alternate C | Alternate Quantity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 202403 | M | Chile | Germany | World | TOTAL CPC | TOTAL MOT | 290722 | 60 | 1 | 0 | kg | 1 | kg | 1 |
| 202311 | M | Chile | USA | World | TOTAL CPC | TOTAL MOT | 290722 | 227 | 3 | 0 | kg | 3 | kg | 3 |
| 202312 | M | Chile | World | World | TOTAL CPC | TOTAL MOT | 290722 | 24693 | 2000 | 0 | kg | 2000 | kg | 2000 |
| 202312 | M | Chile | India | World | TOTAL CPC | TOTAL MOT | 290722 | 24622 | 2000 | 0 | kg | 2000 | kg | 2000 |
| 202312 | M | Chile | Spain | World | TOTAL CPC | TOTAL MOT | 290722 | 43 | 0 | 0 | kg | 0 | kg | 0 |
| 202312 | M | Chile | Areas, nes | World | TOTAL CPC | TOTAL MOT | 290722 | 27 | 0 | 0 | kg | 0 | kg | 0 |
| 202401 | M | Chile | World | World | TOTAL CPC | TOTAL MOT | 290722 | 55494 | 5500 | 0 | kg | 5500 | kg | 5500 |
| 202401 | M | Chile | Italy | World | TOTAL CPC | TOTAL MOT | 290722 | 5274 | 100 | 0 | kg | 100 | kg | 100 |
| 202401 | M | Chile | India | World | TOTAL CPC | TOTAL MOT | 290722 | 50220 | 5400 | 0 | kg | 5400 | kg | 5400 |
| 202402 | M | Chile | World | World | TOTAL CPC | TOTAL MOT | 290722 | 25 | 0 | 0 | kg | 0 | kg | 0 |
| 202402 | M | Chile | Germany | World | TOTAL CPC | TOTAL MOT | 290722 | 25 | 0 | 0 | kg | 0 | kg | 0 |
| 202403 | M | Chile | World | World | TOTAL CPC | TOTAL MOT | 290722 | 1733 | 201 | 0 | kg | 201 | kg | 201 |
| 202403 | M | Chile | Belgium | World | TOTAL CPC | TOTAL MOT | 290722 | 1672 | 200 | 0 | kg | 200 | kg | 200 |
| 202310 | M | Chile | World | World | TOTAL CPC | TOTAL MOT | 290722 | 132 | 1 | 0 | kg | 1 | kg | 1 |
| 202310 | M | Chile | Germany | World | TOTAL CPC | TOTAL MOT | 290722 | 49 | 1 | 0 | kg | 1 | kg | 1 |
| 202310 | M | Chile | Areas, nes | World | TOTAL CPC | TOTAL MOT | 290722 | 82 | 0 | 0 | kg | 0 | kg | 0 |
| 202311 | M | Chile | World | World | TOTAL CPC | TOTAL MOT | 290722 | 276 | 4 | 0 | kg | 4 | kg | 4 |
| 202311 | M | Chile | Germany | World | TOTAL CPC | TOTAL MOT | 290722 | 48 | 1 | 0 | kg | 1 | kg | 1 |

<u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the guidelines set forth in the Standard Chambers Procedures. The brief contains 6146 words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, the Table of Authorities, the signature block, and the present certificate).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ David J. Craven

David J. Craven
Counsel to Jiangxi Brother
Pharmaceutical Co., Ltd.

Craven Trade Law LLC
3744 N Ashland
Chicago, IL 60613
(773) 245-4010
David.craven@tradelaw.com

Date March 23, 2026