**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **JIANGXI BROTHER PHARMACEUTICAL CO., LTD.,**<br><br>      **Plaintiff**<br><br>   **v.**<br><br>**UNITED STATES,**<br><br>         **Defendant,**<br><br>    **and**<br><br>**SOLVAY USA, LLC,**<br><br>       **Defendant-Intervenor.** | **Before: Hon. Timothy C. Stanceu, Judge**<br><br>**Court No. 25-00187** |

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

> Daniel B. Pickard
> Brandon J. Custard
>
> Buchanan Ingersoll & Rooney PC
> 1700 K Street, NW
> Washington, DC 20006
> (202) 452-7000
>
> *Counsel to Solvay USA, LLC*

**Dated: June 26, 2026**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 1

STATEMENT PURSUANT TO RULE 56.2 ......................................................................... 2

    I.    Administrative Determination Under Review ................................................... 2

    II.    Issues Presented for Review ............................................................................. 2

STATEMENT OF THE FACTS ............................................................................................ 3

    I.    Commerce Initiates the Antidumping Duty Investigation of Vanillin from China ............. 3

    II.    In the Preliminary Determination, Commerce Used Chilean Import Data from Global Trade Atlas Under HTS Number 2907.22 to Value Hydroquinone ............................................. 4

    III.    In the Preliminary Determination, Commerce Used the 2023 Financial Statements of SQM and Soprole to Calculate Surrogate Financial Ratios ......................................................... 6

    IV.    In the Final Determination, Commerce Continued to Use the Same Surrogate Value for Hydroquinone and Financial Statements to Calculate Surrogate Financial Ratios ................... 6

        A.    Hydroquinone ...................................................................................... 7

        B.    Surrogate Financial Ratios ................................................................... 9

SUMMARY OF ARGUMENT ............................................................................................11

ARGUMENT ....................................................................................................................... 12

    I.    Standard of Review ........................................................................................ 12

    II.    Surrogate Value Selection .............................................................................. 13

    III.    Commerce's Determination to Value Jiangxi Brother's Hydroquinone Input Using Global Trade Atlas Data Under HTS Number 2907.22 Is Supported by Substantial Evidence and Otherwise in Accordance with Law ................................................................................. 14

    IV.    Commerce's Financial Statement Selection to Calculate Surrogate Financial Ratios is Supported by Substantial Evidence And Otherwise in Accordance with Law ........................ 21

        A.    Commerce Reasonably Relied on the 2023 Financial Statements of Sociedad Química y Minera de Chile S.A. and Soprole Inversiones S.A. to Calculate Surrogate Financial Ratios ....................................................................................... 21

        B.    Commerce Reasonably Did Not Rely on Jiangxi Brother's Preferred Financial Statements to Calculate Surrogate Financial Ratios ............................................... 30

V.    Jiangxi Brother Failed To Exhaust its Administrative Remedies Concerning Commerce's Use of the Cohen's *d* Test in its Differential Pricing Analysis.................................................... 38

    A.    Legal Framework ...................................................................................................... 38

    B.    Jiangxi Brother Failed To Exhaust Its Remedies With Respect To Differential Pricing
       39

CONCLUSION.............................................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boomerang Tube LLC v. United States*,
856 F.3d 908 (Fed. Cir. 2017)..................................................................................38

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007)................................................................................13

*Consol. Bearings Co. v. United States*,
348 F.3d 997 (Fed. Cir. 2003)..................................................................................42

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)..................................................................................13, 29, 34

*Corus Staal B.v. v. U.S.*,
502 F.3d 1370 (Fed. Cir. 2007)…………………………………………..38, 39, 40, 41

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015)..............................................................................3, 15

*Essar Steel, Ltd. v. United States*,
753 F.3d 1368 (Fed. Cir. 2014)................................................................................39

*FMC Corp. v. United States*,
Slip Op. 2003-15 (Ct. Int'l Trade 2003) ...............................................................36

*Home Meridian Int'l Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014)................................................................................28

*Indep. Radionic Workers of Am. v. United States*,
862 F. Supp. 422 (Ct. Int'l Trade 1994) ..........................................................41, 42

*Itochu Bldg. Prods. v. United States*,
733 F.3d 1140 (Fed. Cir. 2013)................................................................................39

*Jacobi Carbons AB v. United States*,
313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) .........................................................13

*Jiaxing Bro. Fastener Co. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016)................................................................................13

*Juancheng Kangtai Chem. Co. v. United States*,
Slip Op. 15-93 (Ct. Int'l Trade 2015) ....................................................................36

i

*Matra Americas, LLC v. United States*,
   681 F. Supp. 3d 1339 (Ct. Int'l Trade 2024) ...........................................................41

*Mittal Steel Galati S.A. v. United States*,
   502 F. Supp. 2d 1295 (Ct. Int'l Trade 2007) ..........................................................29

*Mittal Steel Point Lisas Ltd. v. United States*,
   548 .3d 1375, 1383–84 (Fed. Cir. 2008)..................................................................38

*Musgrave Pencil Co. v. United States*,
   33 C.I.T. 445 (Ct. Int'l Trade April 5, 2007) ..........................................................23

*Nation Ford Chem. Co. v. United States*,
   166 F.3d 1373 (Fed. Cir. 1999)...........................................................................13, 14

*Ningbo Dafa Chem. Fiber Co. v. United States*,
   580 F.3d 1247 (Fed. Cir. 2009)................................................................................12

*NTSF Seafoods Joint Stock Co. v. United States*,
   487 F. Supp. 3d 1310 (Ct. Int'l Trade 2020) ..........................................................25

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011).....................................................................14, 15, 40

*Shanghai Foreign Trade Enters. v. United States*,
   318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ..........................................................23

*Stanley Works (Langfang) Fastening Sys. Co. v. United States*,
   279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) .............................................39, 40, 42

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) ..................................................................................41

*U.S. Steel Corp. v. United States*,
   621 F.3d 1351 (Fed. Cir. 2010).................................................................................13

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009)...................................................................................................12

*Weishan Hongda Aquatic Food Co., Ltd. v. United States*,
   917 F.3d 1353 (Fed. Cir. 2019)...........................................................................15, 25

*Zhejiang DunAn Hetian Metal Co. v. United States*,
   652 F.3d 1333 (Fed. Cir. 2011).........................................................................15, 29

**Statutes**

19 U.S.C. § 351.309(c)(2)....................................................................................................41

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................................12, 40

19 U.S.C. § 1673..............................................................................................................13

19 U.S.C. § 1677b(a) and (c)(1) .......................................................................................29

21 U.S.C. 342(a)(2)(C) ....................................................................................................22

28 U.S.C. § 2637(d) ....................................................................................................38, 43

**Other Authorities**

19 C.F.R. § 351.408(c)(2)..................................................................................................14

19 C.F.R. § 351.408(c)(4)..................................................................................................25

*Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of
   China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85
   Fed. Reg. 8,821 (Dep't Commerce Feb. 18, 2020)....................................................32

*Certain Activated Carbon From the People's Republic of China: Final Results of
   Antidumping Duty Administrative Review; 2013–2014*, 80 Fed. Reg. 61,172
   (Dep't Commerce Oct. 9, 2015) ..................................................................................25

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results
   of Antidumping Duty Administrative Review and Final Determination of No
   Shipments; 2017– 2018,* 85 Fed. Reg. 23,756 (Dep't Commerce Apr. 29,
   2020) ...........................................................................................................................18

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final
   Results of the First Antidumping Duty Administrative Review and First New
   Shipper Review*, 72 Fed. Reg. 52,052 (Dep't Commerce Sept. 12, 2007).........................24, 37

*Certain Steel Threaded Rod From the People's Republic of China*, 76 Fed. Reg.
   68,400 (Dep't Commerce Nov. 4, 2011) .....................................................................27

*Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of
   Vietnam*, 81 Fed. Reg. 75,042 (Dep't Commerce Oct. 28, 2016)............................27

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules,
   From the People's Republic of China: Final Results of Antidumping Duty
   Administrative Review and Final Determination of No Shipments; 2013–
   2014*, 81 Fed. Reg. 39,905 .......................................................................................18

*Final Results of the First Administrative Review of the Antidumping Duty Order*,
76 Fed. Reg. 77,772 (Dep't Commerce Dec. 14, 2011) ...........................................34

*Multilayered Wood Flooring from the People's Republic of China: Final Results
of Antidumping Duty Administrative Review and Final Determination of No
Shipments; 2019-2020*, 87 Fed. Reg. 39,464 (Dep't Commerce June 24, 2022) ...................35

*Notice of Final Determination of Sales at Less Than Fair Value: Silicon Metal
from the Russian Federation*, 68 Fed. Reg. 6,885 (Dep't Commerce Feb. 11,
2003) ..................................................................................................................24, 37

*Utility Scale Wind Towers from the Republic of Korea: Final Results of
Antidumping Duty Administrative Review*; *2022-2023*, 90 Fed. Reg. 19,672
(Dep't Commerce May 9, 2025).........................................................................25, 37

*Vanillin from the People's Republic of China: Final Affirmative Determination of
Sales at Less Than Fair Value,* 90 Fed. Reg. 24,093 (Dep't Commerce June 6,
2025) (P.R. 317)...............................................................................................................2

*Vanillin from the People's Republic of China: Initiation of Less-Than-Fair-Value
Investigation*, 89 Fed. Reg. 54,424 (Dep't. Commerce July 1, 2024) (P.R. 29)........................3

*Vanillin from the People's Republic of China: Preliminary Affirmative
Determination of Sales at Less Than Fair Value, Postponement of Final
Determination and Extension of Provisional Measures*, 90 Fed. Reg. 4,720
(Dep't Commerce Jan. 16, 2025) (P.R. 261) ..........................................................3

*Wire Decking from the People's Republic of China: Final Determination of Sales
at Less Than Fair Value,* 75 Fed. Reg. 32,905 (Dep't Commerce June 10,
2010) ..................................................................................................................23

**INTRODUCTION**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Solvay USA, LLC ("Solvay" or "Petitioner") respectfully responds to the motion for judgment on the agency record filed by plaintiff, Jiangxi Brother Pharmaceutical Co., Ltd. ("Jiangxi Brother"). Jiangxi Brother challenges the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty investigation of vanillin from the People's Republic of China, disputing Commerce's: (1) use of Global Trade Atlas data—rather than UN Comtrade data—to calculate the surrogate value for Jiangxi Brother's hydroquinone input; (2) selection of financial statements to calculate surrogate financial ratios; and (3) use of the Cohen's $d$ test in conducting the agency's differential pricing analysis. As explained below, Jiangxi Brother's motion should be denied because Commerce's final determination is supported by substantial evidence and is otherwise in accordance with law.

The crux of this case is about Jiangxi Brother's preference as to the data source that it wished Commerce had used to calculate the surrogate value for a single input (*i.e.*, hydroquinone) and Jiangxi Brother's disagreement as to probative value the agency afforded certain financial statements used to calculate surrogate financial ratios. But rather than demonstrating why Commerce's determinations are not supported by substantial evidence or are otherwise contrary to law, Jiangxi Brother impermissibly requests the Court to step into the shoes of Commerce, reweigh the record evidence, and order the agency to use Jiangxi Brother's preferred data sources in its margin calculations. The problem with Jiangxi Brother's approach is that both the U.S. Court of Appeals for the Federal Circuit and this Court have held that the Court's duty is not to evaluate whether Commerce used the best available information, but rather whether the evidence is such that a reasonable mind might accept it as adequate to support the conclusion reached. Here, the

record evidence shows that Commerce undeniably meets this standard. Jiangxi Brother also fails to recognize that Commerce's selections need not be perfect under the governing standard.

Finally, Jiangxi Brother urges the Court to overlook the statutory requirement to exhaust one's administrative remedies (and no exception applies here) by challenging Commerce's differential pricing analysis in passing without first raising the argument at any point during the underlying investigation. The Court should not countenance Jiangxi Brother's disregard of this statutory requirement and should dismiss Jiangxi Brother's argument regarding Commerce's differential pricing analysis for failure to exhaust its administrative remedies.

**STATEMENT PURSUANT TO RULE 56.2**

**I.    Administrative Determination Under Review**

This action challenges Commerce's final determination in the antidumping duty investigation of vanillin from China. *See Vanillin from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 90 Fed. Reg. 24,093 (Dep't Commerce June 6, 2025) ("*Final Determination*") (P.R. 317), and the accompanying Issues and Decision Memorandum (June 2, 2025) ("IDM") (P.R. 313). The period of investigation is October 1, 2023, through March 31, 2024.

**II.    Issues Presented for Review**

1.    Whether Commerce's determination to value Jiangxi Brother's hydroquinone input using import statistics from Global Trade Atlas ("GTA") is supported by substantial evidence given that the GTA data is publicly available, based on broader market averages, and is more contemporaneous with the period of investigation ("POI") than the UN Comtrade data?

2.    Whether Commerce's selection of the 2023 Chilean financial statements of Sociedad Química y Minera de Chile S.A. ("SQM") and Soprole Inversiones S.A. ("Soprole") to

calculate surrogate financial ratios is supported by substantial evidence given that the companies are producers of merchandise comparable to vanillin, located in the primary surrogate country, and have not received any subsidies that Commerce has previously found countervailable?

3.      Whether Jiangxi Brother failed to exhaust its administrative remedies with respect to its challenge to Commerce's use of the Cohen *d* test in conducting its differential pricing analysis given that it failed to raise this argument to Commerce in its case brief or at any point during the underlying investigation?

**STATEMENT OF THE FACTS**

**I.**      **Commerce Initiates the Antidumping Duty Investigation of Vanillin from China**

On June 25, 2024, Commerce initiated the less-than-fair-investigation of vanillin from China. *See Vanillin from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 54,424 (Dep't. Commerce July 1, 2024) (P.R. 29). Shortly thereafter, Commerce selected the two largest Chinese exporters of vanillin during the period of investigation for individual examination: (1) Jiangxi Brother and (2) Jiaxing Guihua Imp. & Exp. Co., Ltd. ("Jiaxing Guihua"). *See Vanillin from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 90 Fed. Reg. 4,720 (Dep't Commerce Jan. 16, 2025) ("*Preliminary Determination*") (P.R. 261), and the accompanying Preliminary Decision Memorandum (Jan. 8, 2025) at 2 ("PDM") (P.R. 252).

When, as here, Commerce has determined that the exporting country is a non-market economy country, Commerce "determines normal value by valuing the 'factors of production' used in producing the merchandise in a comparable market economy." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015) ("*Downhole Pipe*") (quoting 19 U.S.C. §

3

1677b(c)(1)(B)).   In this way, Commerce determines "surrogate values" for the factors of production.  *Id.*  On September 16, 2024, Commerce requested comments from interested parties on Commerce's list of economically comparable countries, surrogate value country selection, and surrogate value data.  PDM at 3.  Commerce's Office of Policy identified Chile, Bulgaria, Costa Rica, Mexico, Malaysia, and Türkiye as economically comparable countries at the same level of economic development as China based on per capita 2024 Global National Income data.  *See* Letter from Yang Jin Chun, Program Manager, AD/CVD Operations, Office I, Enforcement and Compliance to All Interested Parties, re: *Investigation of Sales at Less Than Fair Value of Vanillin from the People's Republic of China:  Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (Sept. 16, 2024) (P.R. 113) at Attachment ("Surrogate Country Mem."); PDM at 5.  In response to Commerce's requests for comments, "all interested parties identified Chile as the appropriate primary surrogate country and provided information from Chilean sources to value all factors of production and expenses, as well as Chilean financial statements for the calculation of surrogate financial ratios."  PDM at 7.  Commerce preliminarily selected Chile as the surrogate country because it (1) "is at the same level of economic development as China," (2) is "a significant producer of comparable merchandise," and (3) has "usable and complete data and information  with which to value {factors of production}, such as direct materials, labor, energy, and financial ratios. . . ."  *Id.*  Although relevant, the selection of Chile as the primary surrogate country is not being challenged in this appeal.

II.    **In the Preliminary Determination, Commerce Used Chilean Import Data from Global Trade Atlas Under HTS Number 2907.22 to Value Hydroquinone**

On January 16, 2025, Commerce published the preliminary determination, finding that vanillin from China was "being, or is likely to be, sold in the United States at less than fair value."

*See Preliminary Determination* at 4,720.  Because Jiangxi Brother was the only mandatory respondent with a weighted average dumping margin that was not zero, *de minimis*, or based entirely on facts available, Commerce "preliminarily assigned the dumping margin calculated for Jiangxi Brother to the non-selected respondents eligible for a separate rate."  PDM at 12.[1]

To determine normal value, Commerce used Chilean import statistics as reported by GTA to value certain raw materials and packing materials that Jiangxi Brother used to produce vanillin during the period of investigation.  PDM at 20; Memorandum from Claudia Cott, International Trade Compliance Analyst, AD/CVD Operations, Office I through Yang Jin Chun, Program Manager, AD/CVD Operations, Office I to The File, re: *Investigation of Sales at Less than Fair Value of Vanillin from the People's Republic of China:  Preliminary Surrogate Values Memorandum* (Jan. 8, 2025) (P.R. 256) at 2-3 ("Prelim. SV Mem.").  Commerce determined that the GTA data were contemporaneous with the period of investigation, publicly available, input-specific, tax-exclusive, and representative of a broad market average, consistent with Commerce's preferences in selecting surrogate values.  PDM at 20-21.  Commerce preliminarily valued Jiangxi Brother's raw material input hydroquinone using the Chilean GTA data for "hydroquinone (quinol) and its salts" reported under HTS 2907.22.  Prelim. SV Mem. at 6.  At the preliminary determination, Commerce recognized that the primary unit of measure for hydroquinone in the GTA data was "inconsistent with the {unit of measurement} in Jiangxi Brother's FOP data, {but that} the secondary {unit of measurement} is consistent with the {unit of measurement} in Jiangxi Brother's reported FOP data, i.e., KG."  *Id.*  In other words, Jiangxi Brother reported hydroquinone usage in kilograms and the GTA data also included values on a per kilogram basis.

---

[1] Commerce preliminarily determined that the other mandatory respondent, Jiaxing Guihua, who is not a party to this case, was "ineligible for a separate rate and . . . subject to the China-wide entity rate."  *See* PDM at 12.

**III.**     **In the Preliminary Determination, Commerce Used the 2023 Financial Statements of SQM and Soprole to Calculate Surrogate Financial Ratios**

To value factory overhead expenses, selling, general and administrative (SG&A) expenses, and profit, Commerce preliminarily used the year ending December 31, 2023 audited financial statements of SQM and Soprole, which are producers of merchandise comparable to vanillin "in the chemical industry and in the food industry that produce by-products." PDM at 24. Vanillin has a molecular formula $C_8 H_8 O_3$ or $C_9 H_{10} O_3$. The scope covers natural vanillin, synthetic vanillin, bio-sourced synthetic vanillin (biovanillin) (each also known as 4-Hydroxy-3-methoxybenzaldehyde), and ethylvanillin (also known as 3-Ethoxy-4-hydroxybenzaldehyde). *Preliminary Determination* at Appendix I. Vanillin is used to provide vanilla flavor in food products and also as a fragrance. IDM at 11-12. SQM produces various chemical products, including food additives, and chemicals that are used in food processing, which must be produced to exacting standards fit for human consumption, similar to vanillin. *See* IDM at 12. Similarly, Soprole produces dairy products that use food additives, flavors, and dairy by-products, which are produced to high standards as part of the food industry, similar to vanillin. *See* IDM at 13. Commerce preliminarily determined not to use the financial statements for the three companies proposed by Jiangxi Brother "because the first company (Methanex Corporation) is headquartered in Canada, the second company's (MolymetNos S.A.) unconsolidated financial statements for its Chilean subsidiary do not provide sufficient information to calculate an overhead or {SG&A} ratio, and the third company (Copeval) was unprofitable." Prelim. SV Mem. at 9.

**IV.**     **In the Final Determination, Commerce Continued to Use the Same Surrogate Value for Hydroquinone and Financial Statements to Calculate Surrogate Financial Ratios**

On June 6, 2025, Commerce published the final determination, which found that Jiangxi Brother was selling at dumped prices in the United States. *See Final Determination* at 24,094.

Because Jiangxi Brother's rate was the only rate that was not *de minimis* or based on facts available, Commerce continued to use this rate for the unexamined separate rate respondents. *Id.* In the final determination, Commerce also continued to (1) rely on Chilean GTA import data to determine the surrogate value for Jiangxi Brother's hydroquinone input and (2) derive surrogate financial ratios using the 2023 financial statements of SQM and Soprole, as discussed below. *See* IDM at 9-10, 11-14.

### A.    Hydroquinone

Commerce continued to value Jiangxi Brother's hydroquinone input using Chilean import data from GTA under HTS 2907.22. IDM at 9-10. Commerce explained that when selecting the "best available information for valuing FOPs," its practice is to select "to the extent practicable, surrogate values which are: (1) broad market averages; (2) product-specific; (3) tax-exclusive, non-export average values; (4) contemporaneous with, or closest in time to, the POI; and (5) publicly available." IDM at 9 (citing PDM at 20). In its final determination, Commerce stated that "{b}oth the petitioner and Jiangxi Brother agree{d} that {Commerce} should value hydroquinone using the AUV from HS subheading 2907.22 {, but} the petitioner proposes {that Commerce} base the AUV on the GTA and Jiangxi Brother proposes {that Commerce} base the AUV on UN Comtrade data." IDM at 9-10.

In accordance with its practice for selecting surrogate values, Commerce used the average unit value in the GTA data because it is based on a broader market average than the UN Comtrade data. *Id.* at 10. Specifically, Commerce determined that "petitioner's proposed {average unit value} is based on 10 imports of hydroquinone from at least five different market-economy countries in Europe and North America to Chile in six different months within the POI, whereas Jiangxi Brother's proposed {average unit value} is {only} based on six imports of hydroquinone

from four countries in Europe and North America in four different months within the POI." *Id.* Commerce also rejected Jiangxi Brother's argument that the data from the petitioner was provided by a private source, finding that the GTA data is publicly available. *Id.* Given that both the petitioner and Jiangxi Brother proposed the same HTS subheading for valuing hydroquinone and none of the other criteria in the agency's practice for selecting surrogate values were at issue, Commerce found "that it {was} consistent with {its} practice to use the AUV that is based on a broader market average, *i.e.*, the petitioner's proposed AUV." *Id.*

Furthermore, Commerce addressed Jiangxi Brother's claim regarding "the difference between the units of measurement between the primary unit and the secondary unit of measurement, *i.e.*, kilonewton vs. kilogram, in the underlying GTA data for the petitioner's proposed AUV." *Id.* In response, Commerce explained that it "preliminarily used the petitioner's proposed AUV based on the secondary unit of measurement, *i.e.*, kilogram, because it is based on the most complete dataset on the record." *Id.* Commerce also stated that it did "not find that the difference of the unit of measurement between the primary unit and the secondary unit makes the petitioner's data for its proposed AUV less reliable than Jiangxi Brother's data for its proposed AUV." *Id.* Although Commerce found that "Jiangxi Brother accurately pointed out the difference of the unit of measurement between the primary unit and the secondary unit in the petitioner's proposed data {, Commerce stated that} Jiangxi Brother did not demonstrate that this difference resulted in an inaccuracy in the quantity in the secondary unit of measurement in the petitioner's proposed data." *Id.* Accordingly, for the final determination, Commerce "continue{d} to use the valuation proposed by the petitioner as it is the best available information and is based on a broader market average, publicly available, and reliable." *Id.*

**B.    Surrogate Financial Ratios**

In the final determination, Commerce also continued to use the preliminary surrogate financial ratios based on the financial statements of the same Chilean companies: SQM and Soprole.  *See* IDM at 11.  Commerce explained that "vanillin is a type of food flavor component and {that} Jiangxi Brother produces vanillin using various chemical inputs."  *Id.* at 11-12. Commerce found that SQM and Soprole are Chilean producers of merchandise comparable to vanillin. *Id.* at 12.  Specifically, SQM produces various chemical products in Chile for human and plant nutrients, including iodine and nitrate.  *Id.*  Although Commerce acknowledged that SQM is in the mining business, Commerce determined that this did not negate the fact that SQM produces chemicals comparable to vanillin for human consumption and human injection, either as food additives or medical agents.  *Id.*

With respect to Soprole, Commerce explained that it produces dairy products that use food additives and flavors and dairy by-products, which contain various chemical ingredients.  *Id.* at 13.  Similar to vanillin, Commerce found that these products are produced to high standards within the food industry.  *Id.*  Because these products are part of the food industry and contain various chemical ingredients, Commerce determined that the products can be considered comparable merchandise.  *Id.*  Although Commerce acknowledged that Soprole was not specifically in the chemical industry, Commerce stated that Soprole sells its products wholesale, which contain various chemical ingredients, in a similar way that Jiangxi Brother sells its vanillin to industrial users. *Id.*

Furthermore, Commerce rejected Jiangxi Brother's claim that the agency should use the financial statements of either Methanex, Molymet, or Copeval instead of the financial statements of SQM and Soprole.  *See* IDM at 13-14.  With respect to the financial statements of Methanex

and Molymet, Commerce explained that because their financial statements are consolidated financial statements covering their global operations, their financial statements were not specific to their business operations in Chile. *Id.* at 14. Moreover, Commerce explained that it was "not {its} practice to use consolidated financial statements that cover global operations when {the agency has} usable financial statements specific to the primary surrogate country available on the record." *Id.* Commerce stated that the record shows that Methanex has operations in six different countries including Chile; however, only 12 percent of its sales revenue comes from sales to South America. *Id.*

Regarding Molymet, Commerce determined that its financial statements do not provide sufficient country-specific information as its financial statements are consolidated financial statements covering its global operations in countries such as Belgium, Brazil, China, Germany, Mexico, the United Kingdom, and the United States. *See id.* Commerce also found that the unconsolidated and summarized financial statements for Molymet's Chilean subsidiary (MolymetNos S.A.) do not provide sufficient information to accurately calculate either an overhead or SG&A ratio. *Id.* Importantly, Commerce also found that Molymet primarily produces molybdenum and rhenium, which are metal products and, thus, are not comparable to food chemicals such as vanillin. *Id.*

With respect to Copeval, Commerce explained that it did not use the company's financial statements because it reported a loss in its income statement. *Id.* Even if Copeval had reported a profit for July-September 2024, Commerce stated the financial statements only cover a three-month period that is well after the period of investigation, which is October 1, 2023, through March 31, 2024. *Id.* Finally, Commerce stated that the agency only uses financial statements from

10

profitable companies because the profit ratio is one of the three surrogate financial ratios that the agency calculates in non-market economy cases. *Id.*

**SUMMARY OF ARGUMENT**

Commerce's valuation of Jiangxi Brother's hydroquinone input is lawful and supported by substantial evidence. Although Jiangxi Brother chooses to ignore it, the Court's duty is not to reweigh the probative value of the evidence but rather it is to determine whether that evidence is such that a reasonable mind might accept it as adequate to support the conclusion reached by the agency. Here, Commerce reasonably determined that the GTA import data under HTS 2907.22 represented the best available information to value Jiangxi Brother's input of hydroquinone because it is publicly available, based on a broader market average, and is more contemporaneous to the POI than the UN Comtrade data.

Additionally, Commerce properly relied on financial statements of SQM and Soprole to calculate financial ratios and reasonably declined to use Methanex's, MolymetNos S.A.'s, and Copeval's financial statements. As Commerce explained in the final determination, SQM and Soprole are producers of merchandise comparable to vanillin, located in the primary surrogate country (*i.e.*, Chile), and have not received any subsidies that Commerce has previously found countervailable. The majority of Jiangxi Brother's arguments are assertions without factual or legal support, as well as impermissible requests for the Court to reweigh record evidence. In other words, Jiangxi Brother's arguments in favor of alternative data and financial statements merely reflect disagreements with Commerce's lawful exercise of its discretion to weigh the evidence, and, thus, are not grounds for a remand.

Finally, Jiangxi Brother failed to exhaust administrative remedies with respect to its challenge to Commerce's differential pricing framework. Jiangxi Brother did not challenge

11

Commerce's application of the differential pricing methodology at any point during the investigation. Having failed to exhaust the issue before Commerce, Jiangxi Brother cannot now raise this issue on appeal. And none of the exceptions to the exhaustion requirement apply in this case. Specifically, it would not have been futile for Jiangxi Brother to raise this argument before Commerce, when doing so was necessary to develop the factual record, enable Commerce to decide the issue, and allow for judicial review pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i). The pure question of law exception also does not apply because a claim is not "purely legal" where a remand would require Commerce to perform recalculations or consider other record evidence. Whether the data on this record satisfies the statistical assumptions discussed by the Federal Circuit in the *Marmen Inc. v. United States* decision is a question of fact dependent on the unique facts of this proceeding. Accordingly, the Court should dismiss Jiangxi Brother's challenge to Commerce's use of the Cohen's *d* test in its differential pricing analysis for failure to exhaust its administrative remedies.

## ARGUMENT

### I.    Standard of Review

The Court upholds Commerce determinations that are supported "by substantial evidence on the record" and otherwise "in accordance with law{.}" 19 U.S.C. § 1516a(b)(1)(B)(i). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316, n.6 (2009) (citation omitted)). "Substantial evidence" means "more than a mere scintilla" of evidence that "a reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (internal quotation marks and citations omitted). Even if the Court may draw two inconsistent conclusions from the evidence

contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).  An agency decision may not be overturned "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).

## II.    <u>Surrogate Value Selection</u>

The antidumping duty statute provides for the application of remedial duties to foreign goods sold, or likely to be sold, in the United States "at less than its fair value."  19 U.S.C. § 1673. A dumping margin is the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'"  *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)) (internal footnotes omitted).   When an antidumping duty proceeding involves a non-market economy country, Commerce generally "determines normal value by valuing the factors of production in a surrogate country," using values "referred to as 'surrogate values.'"  *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1352 (Ct. Int'l Trade 2018) (citing 19 U.S.C. § 1677b(c)(1)).  "The factors of production include, but are not limited to: '(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation.'" *Id.* at n.12 (citing 19 U.S.C. § 1677b(c)(3)).  Commerce uses this framework "to construct a hypothetical market value" of the subject merchandise in the non-market economy country.  *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

"The statute directs Commerce to value the factors of production through 'the best available information' in the market economy."  *Jiaxing Bro. Fastener Co. v. United States*, 822

F.3d 1289, 1293 (Fed. Cir. 2016) (quoting 19 U.S.C. § 1677b(c)(1)).  The statute does not define the phrase "best available information," leaving Commerce with "broad discretion" to determine what constitutes the best available information.  *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (citing, *e.g.*, *Nation Ford Chem. Co.*, 166 F.3d at 1377).  In filling the statutory gap, Commerce considers the criteria set forth in its "Policy Bulletin 04.1," including the preference to value all factors of production from a single surrogate country.  *See* Import Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process; 19 C.F.R. § 351.408(c)(2).  To the extent practicable, Commerce selects surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and tax- and duty-exclusive.  IDM at 9.  Commerce has not identified a hierarchy among these factors and weighs the available information to make a product-specific and case-specific decision regarding the best information for each input.  *See* PDM at 6-7 (citing *Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 Fed. Reg. 40,477 (Dep't Commerce Jul. 17, 2006), and accompanying IDM at Comment 1)).

III.   **Commerce's Determination to Value Jiangxi Brother's Hydroquinone Input Using Global Trade Atlas Data Under HTS Number 2907.22 Is Supported by Substantial Evidence and Otherwise in Accordance with Law**

Commerce properly valued Jiangxi Brother's hydroquinone input; the agency's determination was supported by substantial evidence; and each of Jiangxi Brothers' arguments are meritless.  As an initial matter, Jiangxi Brother itself acknowledges that: "There is no dispute as the HTS provision under which {hydroquinone} is classified.  Both Petitioner and JXB agree that the correct HTS provision is 2907.22."  Memorandum of Law in Support of the Rule 56.2 Motion of Plaintiff Jiangxi Brother Pharmaceutical Co., Ltd. for Judgment Upon the Agency Record at 8,

14

ECF No. 36-1 ("Jiangxi Rule 56.2 Memo").  Therefore, the only issue for the Court to decide is whether Commerce's determination to value Jiangxi Brother's hydroquinone input using the GTA data on the record, rather than the UN Comtrade data, is supported by substantial evidence.  For the reasons explained below, the Court should decline Jiangxi Brother's invitation for the Court to step into the shoes of Commerce and reweigh the record evidence because the agency's determination is supported by substantial evidence and otherwise in accordance with law.  *See Downhole Pipe*, 776 F.3d at 1378 ("This court declines Appellants' invitation to reweigh the evidence in order to reject Commerce's conclusions, which were well-supported and fully explained.").

Although Jiangxi Brother chooses to ignore it, "{t}his court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting *Goldlink Indus. Co. v. United States*, 431 F.Supp.2d 1323, 1327 (Ct. Int'l Trade 2006)).  "Commerce has 'broad discretion' to determine what constitutes the best available information, as this term is not defined by statute."  *Weishan Hongda Aquatic Food Co., Ltd. v. United States,* 917 F.3d 1353, 1364-65 (Fed. Cir. 2019) (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)).  In light of Commerce's well-reasoned explanation of its selection process for valuing Jiangxi Brother's hydroquinone input, the Court should find that the agency's selection of the GTA import data under HTS 2907.22 was supported by substantial evidence for a multitude of reasons.  *See Downhole Pipe*, 776 F.3d at 1379.

First, Jiangxi Brother asserts that the GTA data contained "two data points {that} reported two different quantities, one of which was purportedly in Kilonewtons and the other in Kilograms."

15

Jiangxi Rule 56.2 Memo at 8.  In contrast, Jiangxi Brother maintains that the UN Comtrade data "provide{d} the same quantity for both the primary and secondary quantities and both were reported in {k}ilograms. . ." *Id.*  As explained above, Jiangxi Brother raised this argument multiple times; it was addressed multiple times by Commerce; and should be rejected again by the Court. *See* Prelim. SV Mem. at 6; *see also* IDM at 10.

Specifically, in its Preliminary Surrogate Value Memorandum, Commerce acknowledged that the primary unit of measure for hydroquinone in the GTA data "is inconsistent with the {unit of measurement} in Jiangxi Brother's FOP data, {but that} the secondary {unit of measurement} is consistent with the {unit of measurement} in Jiangxi Brother's reported FOP data, *i.e.*, KG." Prelim. SV Mem. at 6.  Jiangxi Brother reiterated this argument and Commerce once again explained in the final determination that Commerce "preliminarily used the petitioner's proposed AUV based on the secondary unit of measurement, *i.e.*, kilogram, {in the GTA data} because it is based on the most complete dataset on the record."  IDM at 10.  Commerce also stated that it did "not find that the difference of the unit of measurement between the primary unit and the secondary unit makes the petitioner's data for its proposed AUV less reliable than Jiangxi Brother's data for its proposed AUV." *Id.*  While Commerce acknowledged that "Jiangxi Brother accurately pointed out the difference of the unit of measurement between the primary unit and the secondary unit in the petitioner's proposed data {, Commerce stated that} Jiangxi Brother did not demonstrate that this difference resulted in an inaccuracy in the quantity in the secondary unit of measurement in the petitioner's proposed data." *Id.*

Like in the underlying investigation, Jiangxi Brother fails to advance any valid reasons why the fact that the GTA data contained two different units of measurements for the primary and secondary quantity fields for hydroquinone indicates that Commerce erred in using the GTA data

to value hydroquinone.  Jiangxi Brother also wrongly asserts that "Commerce used the one 'quantity' which was inconsistent with the rest of the data."  Jiangxi Rule 56.2 Memo at 8.  As Commerce clearly explained in the final determination, "it <u>used the petitioner's proposed AUV based on the secondary unit of measurement, *i.e.*, kilogram{s},</u>" which was consistent with the unit of measure of Jiangxi Brother's reported hydroquinone input.  *See* IDM at 10.  {Emphasis added}.  In short, Commerce used data that was reported in two different measures and selected the unit of measurement that was consistent with Jiangxi Brother's books and records.  Jiangxi Brother cites no contrary Commerce practice or case law that indicates this is impermissible or inappropriate.

Indeed, Jiangxi Brother's argument is faulty as a logical matter.  If a source reports an item by units and also by weight, the fact that the source reports in units first does not make the report by weight any less credible.  In the case here, the GTA data provided information on the surrogate value by two different measures of unit, including by weight.  The fact that data was reported on two different bases – in and of itself – does not make the reporting by kilogram any less reliable.  And as Commerce explained (and Jiangxi Brother cannot refute), there is no information on the record that makes the GTA data less reliable than the UN Comtrade data because it contains different units of measurements under the primary and second quantity fields for hydroquinone.  *Id.*  The Court should therefore find that Jiangxi Brother's argument lacks merit.

Second, Jiangxi Brother wrongly asserts that "the data source {it} provided. . .  is that of a public source (UN Comtrade), while that of petitioner is . . . a private source."  Jiangxi Rule 56.2 Memo at 9.  Jiangxi Brother further contends that:

> Where {Commerce} "has a choice between a public source provided by a well-recognized public organization (the United Nations) and a private source of data, . . . the public source should be given precedence, particularly where, as here, all of

17

the data of the public source is confirmed by its inclusion of the same value data in the private source with additional data also included in the public source.

*Id.*  Contrary to Jiangxi Brother's claims, Commerce addressed this erroneous assertion in the final determination, stating that "the GTA data is publicly available."  IDM at 10.  And for more than a decade, including in the 2010-2011 administrative review of *Certain Activated Carbon from the People's Republic of China,* Commerce has found that the GTA data is a public source.  *Id.* (citing *Certain Activated Carbon from the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Commerce Nov. 9, 2012) and accompanying IDM at Comment 1 ("Finally, the Department previously has found that data from the Global Trade Atlas . . . is publicly-available, represents a broad market average, and is tax and duty exclusive.")).

But if that is not sufficient to end this matter, in prior cases, Commerce has also "declin{ed} to conclude that a data source is not publicly-available solely because it is collected by a private subscription service, and {has} further stat{ed} that Commerce has a longstanding practice of relying on values taken from fee-based sources, including trade publications and the Global Trade Atlas."  *See Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017– 2018,* 85 Fed. Reg. 23,756 (Dep't Commerce Apr. 29, 2020) and accompanying IDM at Comment 2 (citing *Certain Color Television Receivers from the People's Republic of China*, 69 Fed. Reg. 20,594 (Dep't Commerce Apr. 16, 2004) and accompanying IDM at Comment 9) (Emphasis added); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013– 2014*, 81 Fed. Reg. 39,905 (Dept' Commerce

18

Jun. 20, 2016), and accompanying IDM at Comment 21 ("{T}he Department continues to find that the Thai import data for nitrogen obtained from Global Trade Atlas . . . are publicly available, broad market averages, not export prices, tax exclusive, and specific to the input in question; thus, satisfying the critical elements of the Department's SV test.")  In short, Jiangxi Brother fails to cite any record evidence or prior cases supporting the notion that GTA is a private source because none exists.  Indeed, it is Commerce's consistent practice to find that GTA data is publicly available. Therefore, the Court should dismiss Jiangxi Brother's erroneous claim and find that no remand is warranted.

Third, Jiangxi Brother maintains that the UN Comtrade data that it provided to value hydroquinone is broader than the GTA data proposed by Petitioner and used by Commerce.  Jiangxi Rule 56.2 Memo at 9.  In particular, Jiangxi Brother claims that (1) "{e}very shipment included in the {GTA} data . . . is also reflected in the {UN Comtrade} data . . ." and (2) "the total of the GTA data is $82,354 while the total value of the UN Comtrade data was $164,702, or nearly double of the GTA data."  *Id.* at 9-10.  Contrary to Jiangxi Brother's assertion, Commerce's practice is not to determine whether a data source is broader based on the total value of the data contained in the source.  Instead, Commerce's practice is to select, to the extent practicable, "surrogate values that are. . . . broad market averages . . ."  IDM at 9.  A "broad market average" refers to price data that represents a wide, comprehensive, or industry-wide average rather than a single, specific, or potentially skewed transaction price.  Therefore, Jiangxi Brother's apparent claim that the UN Comtrade data contains a broader market average than the GTA data is not supported by the record evidence.

Specifically, Commerce found that the GTA data was "based on 10 imports of hydroquinone from at least five different market-economy countries in Europe and North America

19

to Chile in six different months within the POI, whereas {the UN Comtrade data was only} based on six imports of hydroquinone from four countries in Europe and North America in four different months within the POI." IDM at 10. Therefore, the GTA data is based on broader market averages and is more contemporaneous with the POI than the UN Comtrade data proposed by Jiangxi Brother. *Id.* Commerce has therefore relied on substantial evidence in support of its decision, and Jiangxi Brother never addresses this crucial factual finding.

Fourth, Jiangxi Brother maintains that the primary and secondary quantities in the GTA data used to value hydroquinone are internally inconsistent because certain line items in the data show a variance of 62% and 95%, while other line items show a variance of only 2% to 8%. *See* Jiangxi Rule 56.2 Memo at 10. This is a red herring as Jiangxi Brother itself mentions that kilograms and kilonewtons measure different physical properties. *Id.* at 8. Kilograms measures mass, which is constant, whereas kilonewtons measures force, which is variable. *Id.* Thus, Jiangxi Brother's argument regarding the variance between kilograms and kilonewtons in different line items of the GTA data is an apples-to-oranges comparison. *Id.* Yet putting this fact aside, what is important is that Commerce used the secondary quantity in the GTA data to value hydroquinone, which is reported in the same unit of measurement as Jiangxi Brother's reported hydroquinone (*i.e.*, kilograms). IDM at 10. Finally, given the other factors that Commerce explained that make the GTA data superior to the UN Comtrade data in valuing hydroquinone, including the fact that the GTA data contained "broad{er} market averages" and was more "contemporaneous with, or closest in time to, the POI", the Court should sustain Commerce's use of the GTA data to value hydroquinone. *Id.*

20

**IV.    Commerce's Financial Statement Selection to Calculate Surrogate Financial Ratios is Supported by Substantial Evidence And Otherwise in Accordance with Law**

Commerce's determination to use the 2023 financial statements of SQM and Soprole to calculate surrogate financial ratios is supported by substantial evidence and is otherwise in accordance with the law.  In its brief, Jiangxi Brother argues that "the two financial statements. . . are badly flawed for a broad range of reasons and should not have been selected."  Jiangxi Rule 56.2 Memo at 11.  As demonstrated below, Jiangxi Brother's arguments are unavailing and should be dismissed for several reasons.

**A.    Commerce Reasonably Relied on the 2023 Financial Statements of Sociedad Química y Minera de Chile S.A. and Soprole Inversiones S.A. to Calculate Surrogate Financial Ratios**

First, Jiangxi Brother maintains "that SQM is not a member of the same industry as JBX" which is the "fine chemical industry."  Jiangxi Rule 56.2 Memo at 11.  Jiangxi Brother also contends that "the operations of SQM are primarily involved in the extraction and processing of materials extracted from the ground by SQM."  *Id.* at 13.  Jiangxi Brother, however, claims that it "belongs to the fine chemical industry" which encompasses vanillin, and that "{vanillin} must be produced to high standards to ensure that it can be consumed by humans."  *Id.* at 11-12.

Jiangxi Brother's arguments misconstrue the nature of SQM's business, which while involving upstream mining also critically encompasses chemicals and food additives that, like vanillin, are added into foods, such as nitrates and iodine.  *See* IDM at 12.  Jiangxi Brother also erroneously contends that "{u}sing the Department's logic, the Los Ang{e}les Dodgers are in the Restaurant Business simply because they sell Dodger Dogs at the ballpark ignoring the fact that food is secondary or tertiary to the actual product."  Jiangxi Rule 56.2 Memo at 17.

Although Jiangxi Brother desires the Court to accept the notion that (1) SQM is only a mining company and (2) its sales and production of chemicals, similar to vanillin, are only

ancillary to its operations, SQM's financial statements show that this is not true. The truth of the matter is that SQM is headquartered in Santiago, Chile and is one of the world's largest producers of potassium nitrate. *See* Letter from Buchanan Ingersoll & Rooney PC to Sec'y Commerce, re: *Vanillin from The People's Republic of China: Initial Surrogate Value Submission* (Oct. 25, 2024) (P.R. 167-169) at Exhibit 13 ("Petitioner's Surrogate Values Letter"). Potassium nitrate is a food additive that may be safely used as a curing agent, and sodium nitrate is also a food additive within the meaning of 21 U.S.C. 342(a)(2)(C). *See* IDM at 12 (citing *United States v. Articles of Food … Buffalo Jerky*, 456 F. Supp. 207 (D. Neb 1978)). Since its inception, SQM has produced nitrates, and between 1994 through 1999 invested over 300 million dollars in projects that enabled it to produce potassium chloride. Petitioner's Surrogate Values Letter at Exhibit 13. Further, in 2011, SQM completed the construction of a new potassium nitrate facility in Coya Sur, increasing its overall production capacity of potassium nitrate by 300,000 metric tons per year. *Id*. Moreover, in 2023 (which covers part of the period of investigation), SQM had total revenues of 175.2 million dollars for industrial chemicals, which was a 6.1 percent increase in its sales from the prior year. *Id*. SQM also notes that its large capital expenditure involves:

> {A} US$2.4 billion investment plan for the years 2024-2025. The plan will allow us to expand our operations of lithium, iodine and nitrate. . . . The plan also aims to increase our mining capacity while protecting the environment, reduce operational costs and increase our annual production capacity of nitrates and iodine to meet expected growth in those markets.

*Id*. In other words, in addition to its substantial chemical business, fine chemicals that include food additives comprise a significant part of SQM's business. As such, the record supports Commerce's conclusion that SQM is in the chemical industry and involved in the production of comparable merchandise. While Jiangxi Brother contends that SQM is primarily involved in the extraction of materials from the ground or that SQM's sales of chemicals are akin to the Los

22

Angeles Dodgers' sales of hot dogs, Jiangxi Brother's claims run counter to the record evidence which indicates SQM produces chemicals that are food additives. IDM at 12.

Additionally, Commerce's practice is to consider a product's end use, physical characteristics, and production process in determining comparability; it is not restricted to using products that are comparable along all three fronts, and the conclusion that two products may be comparable for the purposes of surrogate valuation, and yet have different end uses, is not novel. *See, e.g., Musgrave Pencil Co. v. United States,* 33 C.I.T. 445 (Ct. Int'l Trade April 5, 2007); *Shanghai Foreign Trade Enters. v. United States*, 318 F. Supp. 2d 1339, 1348 (Ct. Int'l Trade 2004) (listing past cases in which Commerce "has found comparability despite differences in shape, size and end use," because the "two classes of products {were} made using similar materials and production processes"); *Wire Decking from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 75 Fed. Reg. 32,905 (Dep't Commerce June 10, 2010)*,* and accompanying IDM at Comment 2 ("Although the end use of tyre bead, steel wire rope, other wire products, hinges, nails and blades may differ from wire decking the raw material inputs, production process, and machinery required are sufficiently similar to that of wire decking.").

Here, sodium nitrate, potassium nitrate, potassium chloride, and vanillin share several overlapping end uses across three primary industries: (1) food additives; (2) pharmaceuticals; and (3) cosmetics. *See* Letter from Buchanan Ingersoll & Rooney PC to Sec'y Commerce, re: *Vanillin from the People's Republic of China: Petitions for the Imposition of Antidumping and Countervailing Duties* (June 5, 2024) at Vol. I, p. 3 ("Petition"); *see also* IDM at 13. And potassium chloride "must be produced to exacting standards fit for human consumption, similar to vanillin." IDM at 12. Thus, the record of the underlying investigation shows that SQM is a producer of merchandise comparable to vanillin. While Jiangxi Brother may have preferred Commerce to

select its preferred financial statements, Commerce's final determination is supported by substantial evidence and reasoned conclusions.

Second, Jiangxi Brother contends that SQM's financial statement shows that its "industrial chemical sector showed a gross margin of 19 percent in 2023 {, but} its Iodine and Derivatives Sector showed a gross margin of 60%, and the Lithium and Derivatives Sector showed a gross margin of 43%." Jiangxi Rule 56.2 Memo at 14. Jiangxi Brother also asserts that SQM's revenue in 2023 for its industrial chemicals sector was 2% of the company's total while the total revenue for Iodine was 12% and Lithium was 69% of the total. *Id.* Jiangxi Brother further maintains that SQM's overall profit rate in 2023 was 41%, but that the profit rate for the industrial chemicals sector was only 19%. *Id.* According to Jiangxi Brother, these factors show that the surrogate financial ratios were overstated because the more profitable sectors of SQM's operations were combined with "the only sector which is arguably similar to {Jiangxi Brother}'s operations." *Id.* As explained below, Jiangxi Brother's arguments are legally and factually wrong, and Jiangxi Brother fails to cite a single case in support of its claims.

As an initial matter, Jiangxi Brother's argument that SQM's financial statement should not be used because SQM's divisions had different levels of profitability serves only to concede that Commerce relied on information from a profitable company as the basis for its financial ratios, which is an approach that is consistent with the agency's longstanding practice. As Commerce explained in the final determination, it only uses the financial statements from profitable companies because the profit ratio is the one of the three surrogate financial ratios {that Commerce} calculate{s} in non-market economy. . . cases." *See Notice of Final Determination of Sales at Less Than Fair Value: Silicon Metal from the Russian Federation*, 68 Fed. Reg. 6,885 (Dep't Commerce Feb. 11, 2003), and accompanying IDM at Comment 10; *see also Certain*

24

*Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of the First Antidumping Duty Administrative Review and First New Shipper Review*, 72 Fed. Reg. 52,052 (Dep't Commerce Sep. 12, 2007), and accompanying IDM at Comment 2B; *Utility Scale Wind Towers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; *2022-2023*, 90 Fed. Reg. 19,672 (Dep't Commerce May 9, 2025), and accompanying IDM 6 (citing *Certain Frozen Fish Fillets from Socialist Republic of Vietnam: Final Results of the Antidumping Duty Administrative Review and New Shipper Reviews*, 74 Fed Reg. 11,349 (Dep't Commerce Mar. 17, 2009), and accompanying IDM at Comment 1).  As Jiangxi Brother concedes itself, SQM's financial statement meets the agency's profitability criterion, and Jiangxi Brother fails to cite any cases where Commerce has conducted an analysis of the profitability of different divisions of a company in finding that the company was not suitable to use in deriving the surrogate financial ratios.  Jiangxi Brother's Br. at 14.

Separately, this Court has held that "Commerce is not required under the law to select financial statements from a producer that *primarily* produces comparable merchandise, but is required only to gather information from producers of identical or comparable merchandise in the surrogate country."  *See NTSF Seafoods Joint Stock Co. v. United States*, 487 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2020) (Emphasis in original) (citing 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408(c)(4); *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1365 (Fed. Cir. 2019)).  Additionally, in selecting financial statements to calculate surrogate financial ratios, Commerce has "long found that disparate production volume alone does not render unreasonable data from a surrogate producer."  *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013–2014*, 80 Fed. Reg. 61,172 (Dep't

Commerce Oct. 9, 2015) and accompanying IDM at Comment 2 ("*Certain Activated Carbon from China* Final Results & IDM").

Specifically, in the 2013-2014 administrative review of *Certain Activated Carbon from the People's Republic of China,* the mandatory respondent argued that Commerce should not use the financial statement of a surrogate company "because evidence on the record indicate{d} that only a small part of its revenue {was} earned from the production of activated carbon" (*i.e.*, subject merchandise). *Id.* Commerce rejected the mandatory respondent's argument, finding that the surrogate company was a producer of identical merchandise. *Id.* Commerce also found that although the surrogate company may have only had a comparatively small production volume of subject merchandise, there was no "evidence that the alleged small production volume affect{ed} the calculation of {the} surrogate financial ratios." *Id.*

The Court should find that analogous facts are present in the underlying investigation. Specifically, Commerce found that SQM is a "producer{} of merchandise comparable to vanillin." IDM at 12. And the law does "not require {Commerce} to 'duplicate the exact production experience of" an NME producer, nor must it undertake 'an item-by-item analysis in calculating factory overhead'" or profit. *See Certain Activated Carbon from China* Final Results & IDM at Comment 2. Given that SQM produces merchandise comparable to vanillin, the fact that it also produces non-subject merchandise does not preclude its financial statements from being the best available information on the record.

Third, Jiangxi Brother speculates that it "appears that SQM's operations with respect to exports have been subsidized" and also states that SQM's financial statement shows the receipt of "an unconditional government grant for $24,387 in September 2023, related to the permeance of its commercial office of SQM Shanghai Chemicals Co., Ltd." Jiangxi Rule 56.2 Memo at 15.

According to Jiangxi Brother, because SQM's "financial statement is already, at best questionable, the presence of subsidies is a metaphorical final straw." *Id*. Jiangxi Brother's entire argument is contained in four sentences and should be dismissed. *Id.*

As an initial matter, Jiangxi Brother fails to take into account this Court's finding that "{i}f a financial statement contains only a mere mention that a subsidy was received, and for which there is no additional information <u>as to the specific nature of the subsidy</u>, Commerce <u>will not</u> exclude the financial statement from consideration. IDM at 13 (citing *Clearon Corp. v. United States*, 800 F. Supp. 2d 1,355 (Ct. Int'l Trade 2011). (Emphasis added). In its final determination, Commerce followed its long-standing practice and found that Jiangxi Brother failed to demonstrate that "SQM received subsidies that {Commerce} countervailed in . . . prior countervailing duty cases on products from Chile." *Id.* at 12.

Additionally, Jiangxi Brother fails to provide any information to support its claim that the single government grant that it references in SQM's financial statement relates to the company's export operations. Jiangxi Rule 56.2 Memo at 15. Contrary to Jiangxi Brother's assertions, Commerce's "policy {is} not to reject financial statements on {the} grounds that the company received export subsidies unless {Commerce has} previously found the specific export subsidy to be countervailable." *Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam*, 81 Fed. Reg. 75,042 (Dep't Commerce Oct. 28, 2016) and accompanying IDM at Comment 1. Commerce has also stated that "{g}eneral 'export incentives' are not grounds for {Commerce} to exclude a financial statement for subsidization." *Certain Steel Threaded Rod from the People's Republic of China*, 76 Fed. Reg. 68,400 (Dep't Commerce Nov. 4, 2011) and accompanying IDM at Comment 5. Because Jiangxi Brother fails to cite any cases where

Commerce has countervailed the subsidy that SQM has allegedly received, Jiangxi Brother's argument should be dismissed.

Fourth, Jiangxi Brother claims that Commerce erred in relying on the financial statement of Soprole because the company is allegedly in an entirely different industry from Jiangxi Brother. Jiangxi Rule 56.2 Memo at 15.  In particular, Jiangxi Brother asserts that Soprole is in the dairy industry, rather than the chemical industry, and Soprole's operations do not involve the reaction of chemicals with other chemicals to produce final products.  *Id.*  Jiangxi Brother also states that it "produces and sells its products to industrial users that take {Jiangxi Brother's} chemicals and use them in producing other products" rather than being "simply repacked and resold to the retail market." *Id.* at 16.

Contrary to Jiangxi Brother's assertions, Commerce reasonably explained why SQM's and Soprole's financial statements are the best information on the record to calculate surrogate financial ratios and sufficiently provided the reasons for rejecting the alternatives proposed by Jiangxi Brother.  Specifically, "Soprole produces dairy products, which contain various chemical ingredients" and "are produced to high standards as part of the food industry, similar to vanillin." IDM at 13.  Further, Jiangxi Brother produces vanillin, which is used in dairy products, and Soprole produces food products that include vanillin, such as yogurt.  *Id.*

In addition to the comparability between vanillin and dairy products themselves, including in the production processes, the law only requires financial ratios to be based on companies that are producers of comparable merchandise (rather than identical merchandise as Jiangxi Brother's appears to suggest).  *See* 19 C.F.R § 351.408(c)(4); *see also Home Meridian Int'l Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect.").  In

28

an antidumping duty investigation, Commerce has broad discretion to determine what constitutes the best available information when attempting to construct a hypothetical market value of the subject merchandise in a non-market economy, as the term "best available information" is not defined by statute. *See* 19 U.S.C. § 1677b(a) and (c)(1). Commerce's "best available information" analysis is context and fact dependent. *See Dorbest*, 462 F. Supp. 2d at 1268 (explaining that the best available evidence determination is "one of comparison," requiring "Commerce to select, from the information before it, the best data for calculating an accurate dumping margin"). Here, apart from being a producer of comparable merchandise, Soprole is a profitable company that is headquartered in Santiago, Chile, its information is publicly available, Soprole's financial statements are contemporaneous with the POI, and they met all other necessary requirements to calculate surrogate financial ratios in the investigation. *Id.*

Furthermore, as explained above, the Federal Circuit has held that Court does not "evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation omitted). In other words, the Court "will not second-guess Commerce's choice." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1313 (Ct. Int'l Trade 2007) (explaining that "{w}here Commerce is confronted with two alternatives (both of which have their good and bad qualities), and Commerce has a preferred alternative," substantial evidence review means that the Court "will not second-guess Commerce's choice"); *see Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620, (1966) ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."). Accordingly, for the reasons discussed above, Commerce's selection of Soprole's financial

statements to derive surrogate financial ratios is supported by substantial evidence and otherwise in accordance with law.

### B. Commerce Reasonably Did Not Rely on Jiangxi Brother's Preferred Financial Statements to Calculate Surrogate Financial Ratios

As demonstrated above, Commerce properly relied on the financial statements of SQM and Soprole to calculate surrogate financial ratios and, for the reasons discussed below, reasonably declined to use Methanex's, MolymetNos S.A.'s, and Copeval's financial statements. In its brief, Jiangxi Brother acknowledges that Methanex is located in Canada but contends that "is not a sufficient reason to reject the financial statement of Methanex because "it operated production facilities in a number of countries, including . . . Chile." Jiangxi Rule 56.2 Memo at 15. Jiangxi Brother also asserts that "Methanex lists Chile as one of the countries where it records the majority of its income" and "Chile values represent a greater share of . . . Methanex{'s} operations than the chemical revenue represents of SQM's operations." Jiangxi Rule 56.2 Memo at 18. As explained below, Jiangxi Brother's claims are unavailing and should be rejected.

In the final determination, Commerce stated that "Chile continues to be the primary surrogate country because, *inter alia*, {Commerce has} usable financial statements of Chilean companies." IDM at 13. Thus, Commerce found that it was not appropriate to use "the financial statements of Methanex and Molymet because their financial statements are consolidated financial statements covering their global operations and their financial statements do not provide financial statements specific to their business operations in Chile." *Id.* at 14. (Emphasis added.) Commerce also explained that its practice is not to use consolidated financial statements that cover global operations when, as in the underlying investigation, it has usable financial statements specific to the primary surrogate country (*i.e.*, Chile) available on the record. *Id.*

Consistent with its practice, in the 2015-2016 administrative review of *Solar Cells from the People's Republic of China*, Commerce explained that it "has previously selected unconsolidated financial statements over the consolidated financial statements where the consolidated financial statements reflect operations outside the surrogate country." *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616 (Dep't Commerce July 27, 2018) ("*Solar Cells from China*") and accompanying IDM at Comment 10. Commerce stated that it "has a preference for using financial statements which reflect production of comparable merchandise over non-comparable merchandise." *Id.* While the petitioner in that case urged "Commerce to rely on {the surrogate company's} consolidated financial statements to capture additional affiliates that produce comparable merchandise{, Commerce found that} doing so would also include producers of non-comparable merchandise, and companies from countries that are not economically comparable to China." *Id.* Thus, Commerce found that the petitioner failed to demonstrate why the consolidated statements were preferable when the financial ratios calculated using the unconsolidated statements were a better reflection of the mandatory respondent's operations related to subject merchandise. *Id.* Therefore, in the final results, Commerce continued to rely only on surrogate company's "unconsolidated financial statements in calculating surrogate financial ratios." *Id.*

Moreover, when addressing this very issue in *Alloy and Certain Carbon Steel Threaded Rod from China,* Commerce previously declined to rely on the financial statements of companies that were headquartered outside of the primary surrogate country, explaining that:

> We find that Evraz's financial statements are not Russian financial statements. Evraz is a global steel and mining company headquartered in the United Kingdom. The financial statements of Evraz that the petitioner submitted on the record of this

31

investigation are part of Evraz's 2018 Annual Report which has been prepared in accordance with the information disclosure requirements of the United Kingdom. . . Moreover, throughout the 2018 Annual Report, Evraz repeatedly stated that it complied with Corporate Governance Code of the United Kingdom. Based on its 2018 Annual Report, we find that Evraz is a multinational corporation headquartered in the United Kingdom, not a Russian company. Therefore, we do not have Russian Financial Statements at all on the record of this investigation.

*Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 8,821 (Dep't Commerce Feb. 18, 2020)). Here, with respect to Methanex, Commerce found that it is a multinational company incorporated in Vancouver, Canada and its consolidated financial statements were audited by an accounting firm in Vancouver, Canada. IDM at 14. Therefore, consistent with its long-standing practice, Commerce found that it was not appropriate to rely on producers headquartered outside of the primary surrogate country. *Id.* Further, the record evidence shows that Methanex has operations in six different countries including Chile, but that only 12 percent of its sales revenue comes from sales to South America with Chile being a smaller portion, likely less than 10 percent. *See* Letter from Craven Trade LLC to Sec'y of Commerce, re: *Vanillin from the People's Republic of China; A-570-172; Surrogate Values* (Dec. 9, 2024) at Exhibit FSV-3 Methanex Annual Report at 68 (P.R. 209). Jiangxi Brother, however, contends that Methanex's "production in Chile in 2023 was nearly double that of Canada" and Chile is "one of the countries where it records the majority of its income." Jiangxi Rule 56.2 Memo at 18. What Jiangxi Brother fails to mention, however, is that Canada is the geographical region where Methanex had its lowest source of revenue of five percent during 2023. *See* Jiangxi Brother's SV Submission dated December 9, 2024 at Exhibit FSV-3(b)(ii) at 14. China, Europe, and the United States were the geographical regions where Methanex had its highest percentage of revenue of 28%, 19%, and

32

15%, respectively.  South America was the geographical region with the fourth highest percentage of revenue at 12%, but again it is not clear what percentage of that revenue pertained to Chile.  *Id.*

Moreover, Methanex's production sites are located in the United States, New Zealand, Trinidad and Tobago, Chile, Egypt and Canada.  *Id.*  But, besides Chile, none of these countries are on Commerce's list of countries that are economically comparable to China (*i.e.*, Chile, Bulgaria, Costa Rica, Mexico, Malaysia, and Türkiye).  *See* Surrogate Country Mem. at Att. 1 (Aug. 27, 2024) (P.R. 96).  Moreover, the majority of Methanex's operations are outside the primary surrogate country (*i.e.*, Chile) and, equally problematic is the fact that Methanex's assets in Chile represent less than 3% of its property, plant, and equipment assets.  *See generally* Jiangxi Brother's SV Submission dated December 9, 2024 at Exhibit FSV-3(b)(ii) (P.R. 209).  Thus, consistent with its practice, Commerce found that the financial statements of the Chilean producers of comparable merchandise (*i.e.*, SQM and Soprole) were more appropriate to calculate surrogate financial ratios than Methanex.

Additionally, Jiangxi Brother contends that Methanex's operations in Chile represent a greater share of the company's total revenue than the total revenue of SQM's chemical operations in Chile.  Jiangxi Br. at 18.  Yet as explained above, the revenue figure in Methanex's financial statements pertains to the company's operations in South America as a whole—rather than the company's total revenue for sales to Chile.  *See* Jiangxi Brother's SV Submission dated December 9, 2024 at Exhibit FSV-3 Methanex Annual Report.  Therefore, it is not clear what percentage of Methanex's sales to Chile represent of the company's total sales revenue, and Jiangxi Brother fails to identify the percentage in its brief.

Further, Jiangxi Brother asserts that, similar to its own operations, Methanex converts inputs into new and different chemical products by means of chemical reaction, rather than

33

blending.  Jiangxi Rule 56.2 Memo at 18.  Yet, without more information, Jiangxi Brother fails to demonstrate why vanillin and methanol, which are fundamentally different chemical substances, are more comparable than vanillin and the chemicals that SQM and Soprole produce.  *Id.*  This is particularly true given that, similar to Jiangxi Brother, SQM converts inputs into new and different chemical products by means of chemical reaction.  Specifically, a chemical reaction occurs when SQM transforms sodium nitrate into potassium nitrate, which creates sodium chloride as a by-product.  *See* Petitioner's Surrogate Values Letter dated October 25, 2024 at Exhibit 13 (P.R. 169).  Jiangxi Brother also ignores the fact that "{w}here Commerce is confronted with two alternatives (both of which have their good and bad qualities), and Commerce has a preferred alternative," substantial evidence review means that the Court "will not second-guess Commerce's choice."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620, (1966) ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").  In light of these factors, the Court should find that Commerce's determination not to rely on the financial statement of Methanex to calculate surrogate financial ratios is supported by substantial evidence.

Additionally, Jiangxi Brother disagrees with Commerce's finding that Molymet's consolidated financial statements do not provide sufficient information to calculate either an overhead or SG&A ratio and that it is a global financial statement.  Jiangxi Rule 56.2 Memo at 17-18.  Jiangxi Brother acknowledges that "{w}hile the level of detail is not high, there are no lines of {Molymet's} financial statement which cannot be properly allocated to one of the three Department categories."  *Id.* at 19.  Jiangxi Brother's rationale is flawed for several reasons.  First, Commerce does not have the necessary documentation to "look behind" the financial statements to make the allocations that Jiangxi Brother suggests.  *See Citric Acid and Certain Citrate Salts*

34

*from the People's Republic of China: Final Results of the First Administrative Review of the Antidumping Duty Order*, 76 Fed. Reg. 77,772 (Dep't Commerce Dec. 14, 2011), and accompanying Issues and Decision Memorandum at Comment 9 ("{T}here is no additional description in the surrogate financial statements on interest income and it is the Department's practice to not look behind surrogate financial statements."). Nor would Commerce attempting do so without supporting documentation lead to a more accurate calculation. Second, attempting such an allocation would also be contrary to longstanding practice. Commerce has previously explained that in determining whether to revise surrogate financial ratios, "it is Commerce's practice not to look behind surrogate financial statements." *See, e.g.*, *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 39,464 (Dep't Commerce June 24, 2022) and accompanying Issues and Decision Memorandum at Comment 3. Fundamentally, the unconsolidated information for the Molymet's Chilean subsidiary does not provide sufficient information to calculate either an overhead or SG&A ratio. *See* Jiangxi Brother's Surrogate Values at Exhibit FSV-3 Molymet Annual Report at 198.

Additionally, Jiangxi Brother's arguments should be rejected because, as Commerce explained in the final determination, Molymet's unconsolidated financial statements' "cover{} its global operations in countries such as Belgium, Brazil, China, Germany, Mexico, the United Kingdom, and the United States" rather than Chile—the primary surrogate country." IDM at 14. Jiangxi Brother does not contest the fact that Molymet's financial statements cover its global operations. Jiangxi Rule 56.2 Memo at 17-18. In fact, Jiangxi Brother itself acknowledges that "{i}t is not {Commerce's} practice to use consolidated financial statements that cover global operations when {the agency has} usable financial statements specific to the primary surrogate

35

available on the record." *Id.* at 18 (citing IDM at 14).  Despite acknowledging Commerce's long-standing practice, Jiangxi Brother's only response is that "the Department does not have usable financial statements of record {sic}, and thus this practice is not relevant." *Id.*  Contrary to Jiangxi Brother's assertion, Commerce sufficiently explained why SQM's and Soprole's reflect the best sources to calculate surrogate financial ratios.  And this Court has held that "when Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly." *See FMC Corp. v. United States*, Slip Op. 2003-15 (Ct. Int'l Trade February 11, 2003) (citing *Technoimportexport, UCF. America Inc. v. United States*, 783 F. Supp. 1401, 1406 (Ct. Int'l Trade 1992); *see also Juancheng Kangtai Chem. Co. v. United States*, Slip Op. 15-93 (Ct. Int'l Trade 2015) at 25-26 ("It is not for the court to choose between arguably untainted but incomplete data and arguable complete but tainted data, as that is Commerce's province").

Even if Molymet's consolidated financial statements provided sufficient information to calculate either an overhead or SG&A ratio, Commerce explained that "Molymet primarily produces molybdenum and rhenium, which are metal products and thus not comparable to food chemicals such as vanillin." IDM at 14.  Jiangxi Brother does not address this finding in its brief. Jiangxi Brother Br. at 17-18.  Accordingly, Commerce properly rejected Molymet's consolidated financial statements to calculate surrogate financial ratios.

Finally, Jiangxi Brother maintains that Commerce erred in finding that Copeval was unprofitable and therefore inappropriate to rely on in calculating surrogate financial ratios.  Jiangxi Brother Br. at 19.  It is unclear why Jiangxi Brother contests Commerce's finding, because Jiangxi Brother itself calculated a -1.607% profit rate for Copeval in its surrogate value submission based on the information in Copeval's financial statements.  *See* Letter from Craven Trade Law to Sec'y

36

Commerce, re: *Vanillin from the People's Republic of China; A-570-172; Surrogate Values* (Dec. 9, 2024) at Exhibit FSV-3(d)(i) (P.R. 210).  And as explained in the final determination, Commerce has a long-standing practice of "only using financial statements from profitable companies because the profit ratio is one of the three surrogate financial ratios {that Commerce calculate{s} in non-market economy. . . . cases."  IDM at 14 (citing *Silicon Metal from the Russian Federation*, 68 Fed. Reg. 6,885 (Dep't Commerce Feb. 11, 2003), and accompanying IDM at Comment 10; *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 72 Fed. Reg. 52,052 (Dep't Commerce Sept. 12, 2007), and accompanying IDM at Comment 2B; *Utility Scale Wind Towers from the Republic of Korea*, 90 Fed. Reg. 19,672 (Dep't Commerce May 9, 2025), and accompanying IDM at 6.

In addition to Copeval not being profitable, Commerce also found that its financial statements are not contemporaneous with the POI because they cover the period July – September 2024, which is well after the POI, which covers October 1, 2023 through March 31, 2024.  *See* IDM at 14.  Therefore, consistent with its longstanding practice, Commerce properly rejected Copeval's financial statements for calculating the surrogate financial ratios in this investigation. *See, e.g., Utility Scale Wind Towers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*; 2022-2023, 90 Fed. Reg. 19672 (Dep't Commerce May 9, 2025), and accompanying IDM 6.  Because the statute acknowledges the importance of contemporaneity when calculating antidumping margins, Commerce reasonably considered contemporaneity when determining the best available financial statements on the record to calculate surrogate financial ratios.  *See Qingdao,* 766 F.3d at 1386 (identifying "contemporaneous with the period of review" as one criterion in selecting surrogate values).  Accordingly, for the reasons discussed above, Commerce reasonably selected the 2023 Chilean financial statements of SQM and Soprole

37

to calculate surrogate financial ratios and sufficiently explained its reasons for rejecting the financial statements submitted by Jiangxi Brother.

**V.     Jiangxi Brother Failed To Exhaust its Administrative Remedies Concerning Commerce's Use of the Cohen's *d* Test in its Differential Pricing Analysis**

Jiangxi Brother contends—without referencing a single piece of record evidence—that Commerce's differential pricing analysis "has been expressly overturned . . . in *Marmen Inc. v. United States*", so "{t}o the extent that this analysis becomes relevant . . . ., any new analysis cannot use Cohen's {*d*} in the differential pricing analysis."   *See* Jiangxi Rule 56.2 Memo at 20. The problem here is that Jiangxi Brother did not mention differential pricing anywhere in its case brief to Commerce.  *See, e.g.,* Case Brief. (P.R. 289).  Because Jiangxi Brother failed to exhaust its administrative remedies with respect to its challenge to Commerce's differential pricing analysis, Jiangxi Brother's challenge should be "dismissed . . . without reaching the merits." *Boomerang Tube LLC v. United States*, 856 F.3d 908, 913 (Fed. Cir. 2017).

### A.     Legal Framework

This Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d).  "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*." *Mittal Steel Point Lisas Ltd. v. United States*, 548 .3d 1375, 1383–84 (Fed. Cir. 2008) (*quoting United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)) (emphasis in *Mittal Steel*).

The statutory exhaustion requirement "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal B.v. v. U.S.*, 502 F.3d at 1379 (Fed. Cir. 2007).  "The doctrine

of exhaustion provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998)).

"Exhaustion serves two main purposes: 'to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors,' and to 'promote judicial efficiency by enabling an agency to correct its own errors so as to moot judicial controversies.'" *Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (quoting *Sandvik Steel*, 164 F.3d at 600) (bracketing omitted). Exceptions to the exhaustion requirement are limited, such as when a challenge "would clearly be futile" by requiring a plaintiff to "'go through obviously useless motions,'" or when an issue presents a "pure question of law" that can be addressed without further factual development or exercise of discretion." *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013) (quoting, e.g., *Corus Staal*, 502 F.3d at 1378–79) (other citations omitted).

## B. Jiangxi Brother Failed to Exhaust Its Remedies with Respect to Differential Pricing

There is no dispute that Jiangxi Brother failed to exhaust administrative remedies by failing to raise any challenge to Commerce's differential pricing analysis in its case brief to Commerce. *See generally* Case Brief. (P.R. 289). Thus, the only question is whether an exception to the exhaustion requirement applies. In the underlying investigation, it would not have been futile for Jiangxi Brother to exhaust its differential pricing argument now presented to the Court. *See* Jiangxi Rule 56.2 Memo at 20. "The futility exception to the exhaustion requirement has been applied in

39

situations in which enforcing the exhaustion requirement would mean that parties would be required to go through obviously useless motions in order to preserve their rights." *Corus Staal*, 502 F.3d at 1379 (citation and internal quotation marks omitted). "That exception, however, is a narrow one." *Id*. "The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Id*. (citing *Commc'ns Workers of Am. v. Am. Tel. & Tel. Co.*, 40 F.3d 426, 432–33 (D.C. Cir. 1994)). "Moreover, . . . the Court of International Trade generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Id*. (quoting, *e.g., Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 342 F. Supp. 2d 1191, 1205 (Ct. Int'l Trade 2004)) (other citation omitted).

It would not have been "obviously useless" for Jiangxi Brother to present its current argument to Commerce in the first instance. *See Corus Staal*, 502 F.3d at 1379. Even if an adverse decision from Commerce may have been likely, it would not have been futile for Jiangxi Brother to develop the factual record of its challenge to differential pricing for judicial review pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i). Indeed, one of the core purposes of the exhaustion requirement is "'to allow an administrative agency to perform functions within its special competence,'" including "'to make a factual record{.}'" *Stanley Works (Langfang)*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (quoting *Sandvik Steel*, 164 F.3d at 600) (bracketing omitted). "{T}he burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (internal citation, quotation marks, and bracketing omitted). Having failed to exhaust administrative remedies, Jiangxi Brother is left making an argument to this Court in the first instance, without any citations to record evidence. *See* Jiangxi Rule 56.2 Memo at 20.

Additionally, active challenges to Commerce's use of differential pricing and the Cohen's *d* test continued while the issue was pending review by the Federal Circuit—including in the *Marmen* case. Years prior to Jiangxi Brother's filing of its case brief, the Federal Circuit issued a decision remanding nearly the same issue that Jiangxi Brother now belatedly seeks to raise. *See Stupp Corp. v. United States*, 5 F.4th 1341, 1360 (Fed. Cir. 2021) (remanding for Commerce to address whether Commerce's application of the Cohen's *d* test in the challenged investigation violated the assumptions of normality, sufficient observation size, and roughly equal variances). In February 2024, over a year before Jiangxi Brother submitted its case brief in April 2025, this Court stayed Commerce's remand decision in another case involving differential pricing and Cohen's *d*, confirming that even before the decision in *Marmen*, it was not futile for parties to challenge the differential pricing issue. *See Matra Americas, LLC v. United States*, 681 F. Supp. 3d 1339, 1360–61, 1382 (Ct. Int'l Trade 2024).

Thus, if Jiangxi Brother believed that any challenges to differential pricing and Cohen's *d* continued "to be relevant" to the final determination, it was obliged to raise the issue in its case brief. *See* 19 U.S.C. § 351.309(c)(2). Such exhaustion would not have been futile. Even if Commerce may have ultimately rejected the requested relief, "it would still have been preferable, for purposes of administrative regularity and judicial efficiency, for {Jiangxi Brother} to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results." *See Corus Staal*, 502 F.3d at 1380.

Additionally, the pure question of law exception does not apply here. Jiangxi Brother's argument concerning Commerce's differential pricing analysis is record-based. A claim is not "purely legal" where a remand would require Commerce to perform recalculations and would thus be likely to consider other evidence in the record or even reopen the record. *Indep. Radionic*

*Workers of Am. v. United States*, 862 F. Supp. 422, 434 (Ct. Int'l Trade 1994). "Statutory construction alone is not sufficient to resolve this case." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003). "Rather, the question is whether the methodology is justifiable, and to resolve that issue, a factual record needs to be developed." *Stanley Works*, 279 F. Supp. 3d at 1190 (citing *Consol. Bearings,* 348 F.3d at 1003). Whether the data on this record satisfies the statistical assumptions (*i.e.*, normal distribution, equal variability, and equally and sufficiently numerous data) discussed by the Federal Circuit in the *Marmen* decision is a question of fact dependent on the unique facts of this proceeding. Thus, the issue presented to this Court does not meet the "purely legal" exception to exhaustion.

Finally, to qualify for the intervening judicial decision exception, there must have been an intervening judicial interpretation "which if applied might have materially altered the result." *Hormel*, 312 U.S. at 558–59 (footnote omitted). However, having failed to develop the agency record with its current arguments, Jiangxi Brother cannot show that the *Marmen* decision would materially alter the result in this case. In *Marmen*, the Federal Circuit held that Commerce was "unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *See Marmen*, 134 F.4th at 1348 (emphasis added). The Federal Circuit did not hold that Commerce could never apply Cohen's *d* test in its differential pricing analysis. *Id.* Instead, the Federal Circuit held that Commerce could not rely on Cohen's *d* test for data sets "like those {at issue in *Marmen*}." *Id.* Thus, the Court is presented with only Jiangxi Brother's speculation regarding whether the data in the underlying investigation match conditions in the data subject to the Federal Circuit's ruling in *Marmen*. As discussed above, it would not have been futile for Jiangxi Brother to exhaust this argument to Commerce and, without doing so, Jiangxi Brother

42

cannot demonstrate that the precedent in *Marmen* applies to this case.  Thus, we respectfully request the Court to dismiss Jiangxi Brother's challenge to the differential pricing methodology pursuant to 28 U.S.C. § 2637(d).

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment upon the agency record and sustain Commerce's final determination in all respects.

Respectfully submitted,

*/s/ Daniel B. Pickard*
Daniel B. Pickard, Esq.
Brandon J. Custard, Esq.

**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, NW, Suite 300
Washington, DC 20006
202-452-7936
daniel.pickard@bipc.com

Dated: June 26, 2026                                   *Counsel to Solvay USA, LLC*

43

## CERTIFICATION OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court that the Response Brief contain no more than 13,159 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

Dated: June 26, 2026

*/s/ Brandon J. Custard*
Brandon J. Custard, Esq.